Annette C. THERRIEN et al.

v.

MAINE EMPLOYMENT SECURITY
COMMISSION

and

First Hartford Corporation.

Supreme Judicial Court of Maine.

March 23, 1977.

Linnell, Choate & Webber by G. Curtis Webber, Auburn, for plaintiffs.

Donald J. Gasink, Asst. Atty. Gen., Augusta, for Maine Employment Security Commission.

Jensen, Baird, Gardner, Donovan & Henry by George J. Mitchell, Portland, for First Hartford Corp.

Before DUFRESNE, C. J. and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

GODFREY, Justice.

Appellees claim unemployment benefits under the Maine Employment Security Law, chapter 13 of title 26 of our statutes. Employed as spinners by appellant First Hartford Corporation in its Wyandotte Mill, they were asked to volunteer in what the company proposed as a trial program to determine whether one spinner could efficiently run three frames rather than two as had been the standard practice in the mill.

A frame is a long machine holding seven overhead spools each of which continuously generates twenty-four spinning threads. The job of the spinner is to patrol each frame on both sides, oiling and cleaning the parts occasionally, lifting and filling the spools when they become empty, repairing breaks in the thread, and generally keeping the frame in production. The work entails much walking, some stepping up and down, and vigilance. If a broken thread is not attended to promptly, the resulting pile-up of yarn causes other threads to break, with cumulative disruption and "down time" for the machine.

To study the feasibility of the new assignment, to determine pay rates and evalu-

ate efficiency, the employer had earlier instituted a six-week trial to learn whether one spinner could manage three frames with certain kinds of yarn efficiently and without undue fatigue. Only two spinners had taken part in that earlier trial, receiving incentive bonuses and an increase in hourly pay.

The management of the mill, stating that it needed more data, attempted to institute another six-week trial and asked for two volunteers for each shift. After consulting with the local union pursuant to the controlling collective bargaining agreement, the company offered an increase in base hourly pay from $2.41 to $3.08 to any spinner volunteering for the six-week trial with three frames. No one volunteered.

When management cut the proposed trial period to three weeks, a few spinners volunteered but not enough to carry out the trial effectively. After discussing the problem with officers of the local union and receiving their approval, the management asked each spinner, from the most senior down, to volunteer for the trial. Despite strong efforts at persuasion by the general manager of the mill, all the spinners refused to volunteer except those who had already done so. They asserted that working on three frames would be physically exhausting and that they wanted no part of a three-frame regime, which they believed management had decided to adopt regardless of the results of the experiment. The general manager of the mill denied that the spinners had good cause for their refusal to volunteer. He asserted that the work load would be so adjusted as the experiment went on that no spinner would be worked to a point of undue stress and that the spinners were wrong in their belief that the experiment was a sham.

Still with the union's consent, the manager then began with the spinner having the least seniority and, going up in reverse order of seniority, asked each spinner to take part in the proposed three-week trial with three frames. He told the spinners they would be discharged if no "volunteer" came

forth by a certain time. No more spinners volunteered, and the ten appellees in this case were discharged for refusing to comply with the manager's request.

After a hearing by a deputy of the Employment Security Commission, the claimants were held disqualified from receiving full unemployment benefits pursuant to 26 M.R.S.A. § 1193.2 on the ground that their discharge had resulted from their own misconduct as defined in 26 M.R.S.A. § 1043.23. Their appeal was denied by the appeal tribunal of the Commission on the same ground, and the decision of the appeal tribunal was affirmed by a divided Commission without further hearing or findings. The appeal tribunal regarded the spinners as having breached the collective bargaining agreement between the employer and the union of which they were members, and stated that the breach indicated such an intentional disregard of their duties to the employer as made their refusal "misconduct" for purposes of the Employment Security Law. The appeal tribunal stated as a fact that each claimant "felt that the job was too demanding and if she agreed to the trial period, she would have to continue working under this procedure."

The claimants then filed suit in Superior Court for review of the Commission's decision under 26 M.R.S.A. § 1194.9 and M.R. C.P., Rule 80B. The Superior Court denied claimants' motion for summary judgment but sustained their appeal and reversed the Commission's order on the ground that although the claimants' refusal to enter the trial program may have warranted their discharge under the terms of the union contract, it did not amount to "misconduct" within the meaning of section 1043.23 of title 26. The Superior Court justice deemed their refusal to be founded on a good faith belief that the new program would be "too demanding"—that is, in the interpretation apparently made by the justice, "beyond their capacity to perform".

The Commission and First Hartford, defendants in Superior Court, appeal from the reversal of the Commission's decision.

They attack the justice's decision as beyond the power of the Superior Court to make, on the ground that the Commission had never found as a fact that the spinners' refusal was made in good faith for the reasons they asserted. They also attack the result as an erroneous construction of the definition of misconduct in 26 M.R.S.A. § 1043.23.

The immediate issue before us is whether the Superior Court justice was correct in holding, as a matter of law, that on the facts found by the Commission the employees were not guilty of such misconduct as must result in a reduction of their benefits under the Employment Security Law. The matter has been presented to us in the posture that the spinners refused to comply with a directive from the employer, proper under the relevant collective bargaining agreement, that they assume different duties for a limited time as part of a trial program to determine whether the efficiency of the mill could be increased by a change in work assignments.

First Hartford and the Commission point to provisions of the collective bargaining agreement in which management retains the right "to change existing work loads . . . in order to operate the plant efficiently, and to utilize most productively the working time of employees without adversely affecting the employees' physical or mental health or causing abnormal fatigue" and, more specifically, to institute changes in existing work assignments if certain trial procedures are followed and assent of the local union is obtained. In this case, those procedures were followed at all times with assent of the local union leadership.

Though there was testimony from several employees that from past experience they had found a three-frame regime intolerably demanding on their physique and nerves, the general manager was permitted to testify that certain other employees took care of three frames satisfactorily after the new work assignments went into effect. The Commission made no explicit finding on what effect the changed work load would

have had, in fact, upon the claimants' health. Implicit in the Commission's decision, however, was a determination that the evidence did not establish that the proposed change in work assignment would so adversely affect the spinners' health as to justify their refusal to do the additional work under the terms of the collective bargaining agreement.

The appellants thus take the position that the claimants refused to obey a reasonable direction from the employer to enter the trial, which direction the employer had a right to give by the terms of the collective bargaining agreement. Such a deliberate refusal, appellants say, amounts to misconduct under subsection 23 of 26 M.R.S.A. § 1043, providing as follows:

" 'Misconduct' means conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has a right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer."

Misconduct within subsection 23 brings into play the provisions of 26 M.R.S.A. § 1193.2:

"An individual shall be disqualified for benefits:

.    .    .    .    .

2. For the week in which he has been discharged for misconduct connected with his work, if so found by the commission, and disqualification shall continue for 12 weeks immediately following such week .  .  . ."

Stating that the noncompliance with the collective bargaining agreement should not be decisive by itself on whether the spinners' behavior amounted to misconduct within subsection 23, the Superior Court held them not guilty of misconduct, in effect as a matter of law, upon the ground

that their refusal to enter the trial program was made "in good faith" in the belief that the new work would be "too demanding" and that if they agreed to the trial period they would have to continue working under the three-frame procedure. The presiding justice thought that the facts found by the Commission fully supported a characterization of the employees' refusal as one made in good faith.

■ While we agree with the Superior Court that the standards for the conduct of employees contemplated by sections 1043.23 and 1193 of the Employment Security Act do not coincide with the obligations of employees under a collective bargaining agreement, we think the court erred in finding as a matter of law that the appellees were not guilty of misconduct. In our opinion, the "good faith" of their refusal to enter the trial is not the proper basis for disposition of their claim.

It adds nothing to the effect of the Commission's finding to say that the refusal was made in good faith, for the finding itself implies that the employees' belief was honestly held and that it was truly the cause of their behavior. Sincerity of belief is too subjective a concept to serve satisfactorily as the sole basis for determining a discharged employee's status under the statute. Cases can be easily imagined where an employee's behavior is in fact grounded upon some sincere but irrational belief and where the behavior may be properly deemed misconduct within subsection 23. At a minimum, whatever belief an employee asserts as the reason for his conduct should be measured against a standard of reasonableness under all the circumstances.

Although we sustain the appeal, we think also that the Commission erred in treating the provisions of the collective bargaining agreement as creating the standard against which the spinners' behavior was to be measured for the purpose of determining their status under the Employment Security Law. The case must be remanded to the Commission for further consideration in accordance with this opinion.

■ An employee's intentional failure to comply with known reasonable directives must be examined under subsection 23 in the light of purposes reflected in the Employment Security Act as a whole, especially the various "disqualification" provisions of section 1193. The basic purpose of the act is to afford some economic relief to workers who have become unemployed, on the premise that economic insecurity from unemployment is a menace to the people's health, morals and welfare. 26 M.R.S.A. § 1042. However, to encourage employees to stay at their jobs and to discourage them from leaving voluntarily or getting themselves dismissed for the sake of gaining unemployment benefits, the legislation accords greater benefits to those whose unemployment is essentially involuntary. That policy is reflected in the eligibility conditions established in section 1192 and in most of the provisions for so-called "disqualification" in section 1193; namely, subsection 1 (leaving work voluntarily without good cause attributable to the employment), subsection 2 (being discharged for misconduct connected with the work), subsection 3 (refusing to accept work), and subsection 4 (participating in a stoppage of work because of a labor dispute). Only two provisions of section 1193 seem clearly designed to punish wrongdoing rather than to encourage persons to continue working or to find new work if laid off: subsection 6 (falsifying claims) and subsection 7 (being discharged for crime in connection with one's work). Even those two provisions, where applicable, do not disqualify a claimant from all benefits. A disqualification provided for in section 1193 results in reduction or postponement of unemployment benefits, not necessarily in their total denial. Disqualification for voluntarily quitting or for being discharged for misconduct has the effect, among other things, of exempting the employer's experience rating record from being charged under 26 M.R.S.A. § 1221, the purpose being to avoid assessing the employer because of employees' conduct that is essentially beyond his control and substantially within the unconstrained discretion of his employees.

Subsection 1 of section 1193 provides, in effect, for a reduction in unemployment benefits to an employee who voluntarily leaves his employment without good cause attributable to the employment. The implicit exception favoring the employee who quits for good cause attributable to the employment is discussed, with citation of leading authorities, in our opinion in *Toothaker v. Maine Employment Security Comm'n*, 217 A.2d 203 (Me.1966), where we sustained an application by the Commission of the requirement that a good cause for quitting must be attributable to the employment.

One important purpose behind subsection 2 of section 1193, in postponing benefits to employees whose involuntary discharge has been caused by their own misconduct connected with their work, is closely similar to the purpose behind subsection 1 in prescribing identical consequences for employees who quit voluntarily without good cause attributable to their employment. That purpose is to discourage conduct motivated by a desire to gain unemployment benefits. The two provisions must be construed in a coordinated way to avoid anomalous results in the special type of case where the employee really wants to continue with his employer but reasonably believes he cannot or should not, for the sake of his physical or mental health, do his job as directed and has so notified the employer. In such a situation, the same consequences should attach under section 1193 whether he quits voluntarily or is discharged for not doing the work as directed. Whether he quits or is dismissed in such a case, the Commission must examine carefully the cause of his conduct. If failure to comply with the employer's request were to be deemed automatically ground for disqualification in this kind of case, such an employee would have an incentive to quit rather than indicate that he wanted to continue work but would not comply with the request.

██ In situations where an employee faces imminent changes in industrial methods to which he rationally believes he cannot or should not accommodate himself for reasons of physical or mental health, the purposes of the statute are better served, industrial peace is promoted, and business efficiency is enhanced by an interpretation of the statute that encourages him to communicate his concerns to management. If it should turn out that such an employee cannot work effectively in the changed environment and the employer cannot use him in some other less demanding job, the employer is normally better off if the employment relationship ends promptly than if the employee remains struggling with tasks beyond his physical or mental capability. In such circumstances, if the employer can offer him no other work, the Commission would be warranted in treating the resigning employee as leaving with good cause and hence not disqualified under section 1193.1.A.

██ The inference from section 1193 seems inescapable that an employee who would be deemed to leave for good cause attributable to the employment if he should quit voluntarily cannot be acting in violation or disregard of standards of behavior which the employer has a right to expect of him if, instead of quitting, he refuses for the same reason to comply with the employer's request, at least where he has notified the employer that he will not comply with the request. The same criteria the Commission applies for determining "good cause" for an employee's leaving the job voluntarily should be applied to the cause for which an employee refused to follow the employer's directions.

One of the obstacles to our making a final determination based on the record in this case stems from uncertainty about the meaning of the Commission's finding that the spinners believed the work would be "too demanding" and that if they agreed to the trial period they would have to continue working under the three-frame procedure. The expression "too demanding" is itself imprecise. The justice of the Superior Court appears to have thought it referred to a belief of the employees that the new

work was "beyond their capacity to perform". Although that interpretation may be correct, the Commission may have intended a less extreme meaning: for example, that the spinners believed work on three frames would cause abnormal fatigue or nervous strain.

Moreover, it is not clear whether the finding means the spinners believed that the work during the three-week trial period itself would be "too demanding" or believed that the work would become "too demanding" in the post-trial regime they thought would ensue. There could be a difference in the reasonableness of the belief depending upon the meaning of "too demanding". Thus, the Commission might find that the spinners believed it beyond their ability to perform with three frames over an indefinite time but not for a short trial period. The Commission would then have to determine the reasonableness of the spinners' belief that a three-frame procedure was inevitable after the trial as well as the reasonableness of their belief that such sustained performance was beyond their capability. On the other hand, the Commission might find that the employees believed working with three frames would subject them to undue fatigue or nervous strain even during the trial.

Besides clarifying its finding with respect to the cause of the employees' conduct, the Commission should consider other aspects of the situation besides the collective bargaining agreement. Among other things, the Commission should weigh the relevance and effect of the manager's testimony that he did not tell the spinners they would be dismissed outright if they refused to participate in the trial but that they would be dismissed if none of them decided to participate by a certain time.

On remand, the Commission should clarify its finding with respect to what the spinners believed concerning the effect of the proposed trial upon their own condition.

It should then determine whether they refused to enter the trial because of that belief and whether that belief was reasonable: that is, whether reasonable persons acting reasonably under similar circumstances would have held that belief and acted upon the basis of it.

Finally, if the belief that caused the appellees' conduct is found to have been reasonable, the Commission should determine whether, under all the circumstances, that belief would have constituted good cause for quitting attributable to the employment if the appellees had quit voluntarily for the same reason they had for refusing to comply with the employer's request.

The existing record in this case may be deemed to suffice for making the foregoing determinations. Exactly what the spinners believed that caused them to behave as they did and whether their beliefs were reasonable measured against an objective standard are questions of fact the Commission must answer on remand, subject to the limited judicial review afforded by 26 M.R.S.A. § 1194.9. The claimants have the burden of establishing that their conduct was grounded on a reasonable belief that the industrial trial would have an adverse effect upon their health or would be beyond their capability. Although medical testimony would have been relevant, its absence from the record should not be regarded as making it impossible to assess the rationality of the spinners' beliefs about the effect of the trial upon their condition. Because expert testimony is expensive and increases the complexity of the fact-finding process, it should not normally be required by the Commission in cases of this sort.

The entry is:

Appeals of the Maine Employment Security Commission and First Hartford Corporation sustained. Case remanded to the Superior Court for remand, in turn, to the Employment Security Commission for reconsideration in the light of this opinion.

All Justices concurring.