**Michael L. MESSINA, Appellee,**

v.

**IOWA DEPARTMENT OF JOB
SERVICE, Appellant.**

**No. 69367.**

Supreme Court of Iowa.

Nov. 23, 1983.

Rehearing Denied Dec. 21, 1983.

Walter F. Maley, Blair H. Dewey, and Edmund Schlak, Jr., Des Moines, for appellant.

Martin Ozga, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McCORMICK, and McGIVERIN, JJ.

REYNOLDSON, Chief Justice.

The controlling issue in this appeal is whether an employee is entitled to unemployment benefits when he is discharged for writing a letter to the editor calling for a wildcat strike in direct violation of his union's contract with the employer. The Iowa Department of Job Service (department) found the employee was guilty of misconduct and denied compensation. On review the district court reversed on the ground there was no compelling state interest that would restrict the employee's first amendment right to free speech. We reverse and remand with directions.

The evidence disclosed the employee had worked for Lennox Industries for several years. He had served as union steward of the employees' union and was vice chairman in 1979 and 1980. The employee admitted he was thoroughly familiar with Article 3, Section 2A, of the union's contract with Lennox:

> *[A]ny activity by the Union or an employee to instigate, condone, or participate in a strike, slowdown, or a work stoppage, will be subject to discipline.*

(Emphasis added.)

April 29, 1981, the *Marshalltown Times-Republican* printed a letter written by the employee that contained the following:

> Workers have at their disposal a very effective weapon to get the boss' attention—the strike. The contract now in force must be unilaterally declared to be null and void and all production and shipping brought to a halt until the boss is willing to negotiate, in truthful good faith, a new just and equitable contract.
>
> Two misleaders of the union have told me they don't want to lead a strike because they are "afraid of being sued."

Uncontroverted testimony of the employer disclosed copies of this letter were posted in the plant and "it did disrupt our operation, and we did have some operating problems because of it."

Lennox discharged the employee by a letter that quoted the above contract provision. It further pointed out:

Your statements are inflammatory and slanderous and are intended to promote and incite actions such as strikes, walkouts or slowdowns, which are in conflict with the intent of our Labor Agreement which provides for the peaceful settlement of any labor disputes between the Company, the Union, and its employees.

Following his dismissal, the employee filed a claim for unemployment benefits with the department. A claims representative granted the claim. Lennox appealed and a hearing was held before a hearing officer.

At the hearing the employee testified that in writing the letter he "was simply expressing [his] opinion in accordance with the first amendment of the Constitution of the United States."

The hearing officer held the employee's letter contained "fighting words" and was not within the protection of the first amendment. He found the employee was guilty of misconduct and denied unemployment benefits. The department appeal board summarily affirmed.

The employee filed a petition for judicial review and the district court reversed. The department then instituted this appeal.

The parties raise three issues for our resolution: (1) Was Lennox's appeal from the claims deputy's decision untimely filed so as to void all subsequent proceedings for lack of jurisdiction? (2) Was the employee guilty of misconduct in writing the letter for newspaper publication? (3) Was the state constitutionally compelled to grant the employee compensation benefits because he was exercising his free speech rights under the federal and state constitutions?

I.  *Was the Appeal Timely?*

At the threshold we must examine an issue raised for the first time in this court by the employee. He contends Lennox's appeal from the favorable decision of the claims representative was not filed in time, thus there was no jurisdiction to support any of the subsequent proceedings.

The representative's ruling allowing benefits was filed May 22, 1981, and by rule must be presumed mailed to the parties on the same date. See Iowa Admin.Code 370–4.35(3).

Lennox's notice of appeal was dated June 1, 1981. The parties agree it was mailed the same date. The notice was not received by the department, however, until June 4, 1981, thirteen days after the claims representative's ruling presumably was mailed.

Iowa Code section 96.6(2) provides that: Unless the claimant or other interested party, after notification or *within ten calendar days* after such notification was mailed to the claimant's last known address, *files* an appeal from such decision [of the claims representative], such decision shall be final . . . .

(Emphasis added.) Compliance with this appeal provision is jurisdictional. *Beardslee v. Iowa Department of Job Services,* 276 N.W.2d 373, 377 (Iowa 1979). If the employee's contention is adopted, then the appeal notice was three days late, and in the absence of a constitutional challenge, the department and district court would be divested of authority in the subsequent proceedings. *See City of Des Moines v. Civil Service Commission,* 334 N.W.2d 133, 136 (Iowa 1983); *Franklin v. Iowa Department of Job Service,* 277 N.W.2d 877, 881 (Iowa 1979).

The employee argues the issue is controlled by the department's rule, Iowa Administrative Code 370–6.2(1):

a.  A party appealing from a decision of a representative of the department shall mail to the appeals section, Iowa Department of Job Service . . . Des Moines, Iowa . . . within ten calendar days after such decision was mailed . . . a notice of appeal . . . .

b.  The date of receipt of the notice of appeal in the appeal section will be used to determine the timeliness of the appeal.

The department has also provided the following rule, Iowa Administrative Code 370–4.35(1):

Except as otherwise provided by statute or by department rule, any ... appeal, ... notice, ... submitted to the department *shall be considered received by and filed with the department:*

a. *If transmitted via the United States postal service ... on the date it is mailed* as shown by the postmark, or in the absence of a postmark the postage meter mark of the envelope in which it is received; or if not postmarked or postage meter marked or if the mark is illegible, on the date entered on the document as the date of completion.

b. If transmitted by any means other than the United States postal service or its successor, on the date it is received by the department.

(Emphasis added.) In oral argument in the submission of this appeal, the department relied on the last-quoted rule. We have observed that 370–4.35(1) is within the authority granted the department by the legislature. *See Cosper v. Iowa Department of Job Service*, 321 N.W.2d 6, 8 (Iowa 1982).

In the interpretation of statutes, all relevant legislative enactments must be harmonized, each with the other, so as to give meaning to all if possible. *Drake v. Polk County Board of Supervisors*, 340 N.W.2d 247, 249–50 (Iowa 1983), quoting *Matter of Estate of Bliven*, 236 N.W.2d 366, 369 (Iowa 1975). Generally, the rules of statutory construction and interpretation also govern the construction and interpretation of rules and regulations of administrative agencies. *Motor Club of Iowa v. Department of Transportation*, 251 N.W.2d 510, 518 (Iowa 1977). We must construe these rules together with Iowa Code section 96.6(2) to harmonize them, using common sense and sound reason. *See* 2 Am.Jur.2d *Administrative Law* § 307 at 135 (1962).

In *Beardslee*, 276 N.W.2d at 376, we found the purpose of Iowa Code section 96.6(2) is "to provide ten days for appeal after mailing of the notice of agency decision." In the 1971 Iowa Code, section 96.6(2) provided a five-day limit for those re-ceiving delivered notice, and a seven-day limit for mailed notice, the extra two days being allowed for what was then the ordinary time required to deliver mail. *See Smith v. Iowa Employment Security Commission*, 212 N.W.2d 471, 473 (Iowa 1973).

In *Smith*, 212 N.W.2d at 473–74, we held that the seven-day mailing rule, under then current mail delivery, deprived a claimant "of the due process he [was] entitled to and which the legislature intended him to have," at least when the claimant, following receipt of claim disallowance, had only three days to seek out a lawyer, obtain advice, and decide whether to appeal. Our opinion did not address the further problem of time required for return mail. The same analysis undergirded our decision in *Eves v. Iowa Employment Security Commission*, 211 N.W.2d 324 (Iowa 1973), in which we held the seven-day rule did not afford a claimant "reasonable opportunity for fair hearing" as required by Iowa Code section 96.6(3). We there wrote:

> Such limited time of notice is of dubious validity when the recent and continuing breakdown in United States mail deliveries assumes proportions of a national disaster.

*Id.* at 326.

Following *Smith* and *Eves*, the legislature extended the section 96.6(2) appeal time to ten days. 1979 Iowa Acts ch. 33, § 13(2). We assume the department had similar concerns relating to mail service when, in rule 370–4.35(1), it eliminated the return mail time by providing that an appeal would be "considered received by and filed with the department" on the date mailed. An analogous concept is found in Iowa Rule of Appellate Procedure 30 ("Filing may be accomplished by mail addressed to the clerk of the supreme court, and shall be deemed filed on the day of mailing."). *See also* Iowa R.Civ.P. 82(b) and 83(b).

We hold rule 370–6.2(1), relied on by the employee in arguing Lennox's appeal was untimely, may be reconciled with 370–4.35(1). Rule 370–6.2(1)(a) seems to mandate that an appeal be sent by mail. As-

suming without deciding the validity of that requirement, it is all the more reason, of course, for the rule 370–4.35(1) provision that the appeal will be considered received and filed when mailed. Otherwise, the party's appeal right would be further limited in time and subjected to the hazards of an uncertain postal service. It is significant that 370–6.2(1)(a) provides that the appeal shall be *mailed* (not delivered) "within ten calendar days after such decision." This provision is entirely consistent with the language of 370–4.35(1).

■ Although superficially inconsistent with rule 370–4.35(1), the puzzling language of 370–6.2(1)(b) may also be reconciled. The latter rule simply provides that the timeliness of the appeal shall turn on "the date of receipt of the notice of appeal in the appeal section." What is considered the date of receipt? Rule 370–4.35(1) answers that question by providing the appeal "shall be considered received" when mailed. Any other construction of 370–6.- 2(1)(a) would subject this regulatory scheme to the same claims of basic unfairness and due process challenges raised in *Eves* and *Smith*.

■ We hold Lennox's notice of appeal was timely, therefore the department and district court had jurisdiction in the subsequent proceedings.

## II. *Was the Employee Guilty of Misconduct?*

■ An applicant for unemployment benefits who is discharged for misconduct is subjected to a limited disqualification. Iowa Code § 96.5(2). "Misconduct" is not statutorily defined, an omission supplied by a department rule, 370–4.32(1)(a). We quoted the full rule in *Cosper*, 321 N.W.2d at 9. Relevant here is this portion:

Misconduct is defined as a deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment. Misconduct . . . is . . . limited to conduct [that] . . . show[s] an intentional and substantial

disregard . . . of the employee's duties and obligations to the employer.

We have said the rule 370–4.32(1)(a) definition accurately reflects the intention of the legislature. *Kehde v. Iowa Department of Job Service,* 318 N.W.2d 202, 206 (Iowa 1982); *Huntoon v. Iowa Department of Job Services,* 275 N.W.2d 445, 448 (Iowa), *cert. denied,* 444 U.S. 852, 100 S.Ct. 105, 62 L.Ed.2d 68 (1979).

In this case the employee's "contract of employment" included a labor agreement negotiated between the employee's union and Lennox. Its introductory provisions included this statement:

[I]t is the intent and purpose of the Company and Union to establish and promote harmonious and cooperative relations between the Company, the Union, and the employees covered by this Agreement to provide procedures for the peaceful and equitable adjustment of grievances; to prevent lockouts, strikes, slowdowns, and work stoppages, during the term of this Agreement : . . . .

To that end, Article 3, Section 2A, provided that *"any activity by* the Union or *an employee to instigate,* condone, or participate in *a strike, slowdown, or a work stoppage, will be subject to discipline."* (Emphasis added.)

As we have noted, the employee, a former officer and steward of the union, conceded he was familiar with this provision of the negotiated contract. Nonetheless, he called for a repudiation of the labor agreement and for a wildcat strike by a letter published in the Marshalltown (1980 census population 26,938) newspaper serving the Lennox plant community. That his efforts were only partially successful was clearly no fault of the employee.

■ Absent first amendment implications, it is obvious the employee's call for a wildcat strike directly violated his contractual duty to Lennox not to engage in any activity to instigate a strike during the period of the labor agreement. Cast in the language of rule 370–4.32(1)(a), this was "an intentional and substantial disregard . . . of the employee's duties and obliga-

tions to the employer," and constituted Iowa Code section 96.5(2) misconduct unless the state is constitutionally prohibited from denying unemployment benefits to the employee.

Supportive of the above analysis are a number of decisions from other jurisdictions holding employees discharged for violating labor agreements guilty of statutory misconduct, and thus not entitled to state unemployment benefits. *E.g., ITT Continental Baking Co. v. Davila,* 388 So.2d 1254, 1258 (Fla.Dist.Ct.App.1980) ("We cannot uphold an award of unemployment benefits to an employee who suddenly decides to walk off the job ... when he does so of his own free will in intentional violation of a specific no-strike clause in the collective bargaining agreement between his union and his employer."); *Bogue Electric Co. v. Board of Review of the Division of Employment Security of the Department of Labor and Industry,* 21 N.J. 431, 436, 122 A.2d 615, 618 (1956) ("It would be in plain derogation of the spirit and policy of the act—protection against the hazard of *involuntary* unemployment—to provide unemployment benefits to employees who were lawfully discharged for a deliberate breach of a contract to which they were parties."); *Hussar v. Commonwealth Unemployment Compensation Board of Review,* 61 Pa.Commw. 28, 33, 432 A.2d 643, 646 (1981) ("The Board found that the claimant attempted to induce employees in the wax booth area of the plant's paint department to support an illegal work stoppage .... Once the claimant's participation in, or the encouragement of, the illegal work stoppage is established, the law is clear that such conduct constitutes willful misconduct ...."); *Universal Foundry Co. v. Department of Industry, Labor and Human Relations,* 86 Wis.2d 582, 592–93, 273 N.W.2d 324, 329 (1979) (Employee's "informational picketing" held to be "a violation ... of the collective bargaining agreement ... [constituting] a willful interference with the company's interests and, therefore, ... misconduct."). Although the issue in *Central Foam Corp. v. Barrett,* 266 N.W.2d 33 (Iowa 1978), was whether the employees were disqualified

for unemployment under Iowa Code section 96.5(1) ("Voluntary quitting"), it is noteworthy that several of the employees who walked off the job in violation of their no strike—no lockout contract were penalized four weeks for misconduct, from which ruling no appeal was taken. *Id.* at 34.

In this case the employee seeks to avoid disqualification for misconduct by asserting he merely was exercising his first amendment right of free speech. We turn, then, to an examination of this contention.

### III. *Is the Department Constitutionally Prohibited From Denying the Employee Unemployment Benefits?*

The hearing officer's decision, adopted by the agency, mentions "fighting words" as an exception to first amendment protections. That ruling could not be sustained, of course, to the extent it was based on that exception, if it was. "Fighting words" generally are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace in a face-to-face encounter. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572–73, 62 S.Ct. 766, 769–70, 86 L.Ed. 1031, 1035–36 (1942); *see Lewis v. City of New Orleans,* 415 U.S. 130, 132, 94 S.Ct. 970, 972, 39 L.Ed.2d 214, 219 (1974); *Gooding v. Wilson,* 405 U.S. 518, 522–23, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408, 414 (1972). The deputy's ruling, however, clearly is based on a finding that the claimant's activity was in violation of the labor agreement and that his "instigations caused problems among the workers and the employer."

In reversing on review, the district court held "[t]he letter to the editor was protected under the First Amendment and said right to speak cannot be restricted by the State unless there is a compelling State interest." The court did not address the contract violation issue. Without reference to the department's contrary finding on uncontroverted evidence, the district court independently found "[t]here was no evidence that the letter caused any demonstrable harm to the employer."

Courts do not hear contested cases under the Administrative Procedure Act de novo. *Cook v. Iowa Department of Job Service,* 299 N.W.2d 698, 701 (Iowa 1980). Although the agency's decision must be supported "by substantial evidence in the record made before the agency when that record is viewed as whole," Iowa Code section 17A.19(8)(f) (1983), "substantial evidence" under this standard is that which a reasonable mind would accept as adequate to reach a given conclusion, even if a review court would have drawn a contrary inference from the evidence. *Iowa Health Systems Agency, Inc. v. Wade,* 327 N.W.2d 732, 733–34 (Iowa 1982). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence. *Peoples Memorial Hospital v. Iowa Civil Rights Commission,* 322 N.W.2d 87, 91 (Iowa 1982). We hold the hearing officer's finding that the employee's letter caused "problems" between the labor force and Lennox was supported by substantial evidence, and that the district court had no ground in fact or law to reach a contrary finding. On this basis we turn to the question whether the district court properly applied the law, *Cook,* 299 N.W.2d at 701, applying the section 17A.19(8) standards to determine whether this court's conclusions are the same as those of the district court.

The employee argues that although generally a private employer may fire an employee for the exercise of otherwise protected speech, the grant or denial of government benefits cannot be premised on the exercise of a person's free speech rights, in absence of a compelling state interest. He relies on *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); and several other decisions, none of which involved an employee violation of an express contractual provision based upon adequate consideration. *See Thornton v. Department of Human Resources Development,* 32 Cal.App.3d 180, 107 Cal.Rptr. 892 (1973); *DeGrego v. Levine,* 46 A.D.2d 253, 362 N.Y.S.2d 207 (1974), *aff'd,* 39 N.Y.2d 180, 347 N.E.2d 611, 383 N.Y.S.2d 250 (1976); *Wright v. Commonwealth of Pennsylvania Unemployment Compensation Board of Review,* 45 Pa.Commw. 117, 404 A.2d 792 (1979). These cases are factually inapposite: not one involves the deliberate violation of a formal contract.

There was *no* contract in *Perry,* and no instigation of a strike in the face of a no-strike provision negotiated at arm's length and for consideration between parties of equal strength. The opinion simply holds, as we observed in *Bishop v. Keystone Area Education Agency No. 1,* 311 N.W.2d 279, 284 (Iowa 1981), that the state ordinarily cannot discharge a public employee merely for expressing his or her opinion on public issues.

Like several other decisions the employee relies on, *Sherbert* involved religion, not speech. *See Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Sherbert, a Seventh-Day Adventist, was discharged because she would not work on Saturday. She was denied unemployment benefits. The court held that government could not permissibly require an employee to choose between abandoning the precepts of her religion in order to work and following her religion and forfeiting unemployment benefits. 374 U.S. at 404, 83 S.Ct. at 1794, 10 L.Ed.2d at 970.

Later federal decisions have not accorded *Sherbert* all the force this employee would claim for it. In *Linscott v. Millers Falls Co.,* 440 F.2d 14 (1st Cir.), *cert. denied,* 404 U.S. 872, 92 S.Ct. 77, 30 L.Ed.2d 116 (1971), the court affirmed dismissal of a damage suit brought by a Seventh-Day Adventist against her union-shop employer and her union. She was discharged because her religious belief forbade her paying union initiation fees and dues. The majority acknowledged provisions of the Labor-Management Relations Act provided "the governmental activity necessary to bring the First Amendment in play," *id.* at 16, citing *Railway Employes' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed.

1112 (1956) (holding in favor of union shop over employee's constitutional rights). Nonetheless, the *Linscott* court summarily distinguished *Sherbert* with the following rationale:

> In the present case the interests are not merely that of the plaintiff versus the cost to the fisc; opposed to plaintiff's interest are both the public and private interests in collective bargaining and industrial peace.

440 F.2d at 18.

■■ A. *Waiver.* The department contends the employee waived his free speech right to call for a wildcat strike by the provisions of the labor agreement, and cannot now assert it. That basic constitutional rights may be waived, even in the context of criminal investigations and trials where liberty is at stake, is a well-established principle applied constantly in our criminal appeals.

We already have noted that the employee, a former union official,[1] had full knowledge of this provision in the negotiated contract. There is a plain inference the agreement contained a no-lockout provision binding the employer, and "procedures for the peaceful and equitable adjustment of grievances." The employee's testimony did not even suggest the labor agreement was not negotiated between parties of equal strength, at arm's length. Nor did he assert there was insufficient consideration for the provision, binding on the union *and its employees*, not to instigate a strike, slowdown or work stoppage. The same provision provided for the violator to be disciplined.

■■ That a union may so negotiate away a union member's rights is beyond question. National labor policy "extinguishes the individual employee's power to order his [or her] own relations with [the] employer" and creates a power vested in the union to act in the interests of all employees. *NLRB v. Allis-Chalmers*

*Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123, 1127 (1967). Although the 1959 Landrum-Griffin amendments provide union members some protections to ensure fair procedures and free speech with respect to election of union officials, *see* 29 U.S.C. § 411 (1976); *Mallick v. International Brotherhood of Electrical Workers*, 644 F.2d 228, 235 (3d Cir.1981), the union may bargain away the member's right to strike during the contract period, and may try and fine the member for working in defiance of a union-called strike. *Allis-Chalmers*, 388 U.S. at 184–95, 87 S.Ct. at 2008–14, 18 L.Ed.2d at 1130–36. *See also Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356–57, 100 L.Ed. 309, 319 (1956) ("Provided the selection of the bargaining representative remains free, such [no-strike] waivers contribute to the normal flow of commerce and to the maintenance of regular production schedules. Individuals violating such clauses appropriately lose their status as employees.").

Courts, upon proper showing, recognize the concept of contractual waiver of constitutional rights in civil cases. In *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), the Court affirmed judgment on a cognovit note in which the maker waived the basic constitutional due process rights of notice and hearing. The Court applied the usual standards requiring the waiver to be voluntary, knowingly and intelligently made, and noted the contract did not result from unequal bargaining power or overreaching. *Id.* at 185–86, 92 S.Ct. at 782, 31 L.Ed.2d at 134. There, as here, the contractual waiver was based on good consideration. The concept of waiver of first amendment rights was recognized in *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686 (6th Cir. 1981), although not applied, the court stating:

---

1. Courts have recognized a distinction between union officials and rank-and-file union members in meting out employee discipline. *See Liotta v. National Forge Co.*, 473 F.Supp. 1139, 1144 (W.D.Pa.1979), *aff'd in part and rev'd in part*, 629 F.2d 903 (3d Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2045, 2046, 68 L.Ed.2d 348 (1981).

Unlike *Overmyer*, this case does not present a situation where there is an agreement which is binding as a matter of state contract law. *Overmyer*, indicates, however, that in the civil context the presence of consideration will constitute some evidence of waiver. We cannot find sufficient consideration here to evidence a waiver ....

*Id.* at 691.

In two cases where valid collective bargaining agreements were in effect, courts intervened to prevent work stoppages, despite the claimed first amendment rights to express political views by not unloading Russian ships. *New Orleans Steamship Association v. General Longshore Workers*, 626 F.2d 455, 463 (5th Cir.1980), *aff'd*, 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982); *West Gulf Maritime Association v. International Longshoremen's Association*, 413 F.Supp. 372, 376 (S.D.Tex.1975), *aff'd without opinion*, 531 F.2d 574 (5th Cir.1976) ("[T]his Court does not believe the institution of a work stoppage in violation of valid contract provisions is a valid argument for First Amendment protection. A First Amendment right can be waived, and was in this case.").

■ This employee does not argue that a free speech right may not be contractually waived. Rather, he asserts the employer and the department did not raise this issue before and cannot assert it now. Although we do not find, on the basis of the skimpy record before us, that either employed the word "waiver," we are convinced the issue was litigated. This case presents the unusual situation in which the waiver was expressly set out in the terms of the contract. The employer before the hearing officer, and the department before the district court, consistently asserted, in response to employee's first amendment contention, that the conduct was in direct violation of the labor agreement in which the union and its members expressly contracted to refrain from activity to instigate a wildcat strike. Whether labeled "waiver" or not, the fight was over whether the employee could do what he did, with the

resulting impact on Lennox's operation, after agreeing in writing not to. We hold the waiver issue may be determined as an incident to the expressed issue, *see Presbytery of Southeast Iowa v. Harris*, 226 N.W.2d 232, 234 (Iowa), *cert. denied*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975), and inheres in the contentions advanced at all times by the employer and the department, presenting a question of law that should be decided. *Frederick v. Shorman*, 259 Iowa 1050, 1056–57, 147 N.W.2d 478, 482 (1966).

■ We hold that this employee, in the circumstances presented by this case, contractually waived his asserted first amendment free speech right to call for a wildcat strike and cannot assert it now to avoid a finding of statutory misconduct.

■ B. *Compelling State Interests.* Finally, we hold compelling state interests, balanced against the employee's asserted first amendment right, dictate rejection of his claim for unemployment benefits in this instance. Courts should at least know what everyone else knows, *Stenberg v. Buckley*, 245 Iowa 622, 627, 61 N.W.2d 452, 455 (1954), and we judicially note the state unemployment compensation fund has not been and is not now a bottomless and overflowing source of money. In Iowa it has required extensive borrowing from the federal government to pay benefits. The legislature in the last session was required to lower benefits and raise employer contributions. *See* 1983 *Iowa Legis.Serv.* 1171 (West), amending Iowa Code chapter 96.

This is a concern recognized by the Supreme Court as early as 1977 in *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 492–93, 97 S.Ct. 1898, 1910, 52 L.Ed.2d 513, 529 (1977):

The third rationale offered by the State is its interest in protecting the fiscal integrity of its compensation fund. This has been a continuing concern of Congress and the States with regard to unemployment compensation systems. See Report of the Committee on Economic Security ...; Hearing on H.F. 6900 before the Senate Committee on Finance,

94th Cong., 1st Sess. (1975). It is clear that protection of the fiscal integrity of the fund is a legitimate concern of the State.

■ The fiscal integrity of the fund should not be jeopardized by payments to employees who are discharged for deliberate violation of express provisions of their employment contract. This would strike at the expressed state interest disclosed by the legislature in creating the fund:

> The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure ... for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.*

Iowa Code § 96.2 (1983) (emphasis added). *See Bala v. Commonwealth Unemployment Compensation Board of Review*, 42 Pa.Commw. 487, 503–04, 400 A.2d 1359, 1368–69 (1979); *see also Bogue Electric Co.*, 21 N.J. at 436, 122 A.2d at 618 ("It would be in plain derogation of the spirit and policy of the act ... to provide unemployment benefits to employees who were lawfully discharged for a deliberate breach of a contract to which they were parties.").

Another compelling factor is the state's interest in collective bargaining and industrial peace. *See Linscott*, 440 F.2d at 18 ("[i]n the present case the interests are not merely that of the plaintiff versus the cost to the fisc; opposed to plaintiff's interest are both the public and private interests in collective bargaining and industrial peace"). The importance of this interest also has been recognized by the Supreme Court:

> A fundamental aim of the National Labor Relations Act is the establishment and maintenance of industrial peace to preserve the flow of interstate commerce. ... Central to achievement of this purpose is the promotion of collective bargaining as a method of defusing and channeling conflict between labor and management.

*First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318, 327–28 (1981). The viability of this interest in the face of an employer's free speech challenge was judicially affirmed in *Bausch & Lomb Inc. v. NLRB*, 451 F.2d 873, 877–80 (2d Cir.1971). The second circuit court recognized that the board's standards for elections may have a "minimal chilling effect" on speech, *id.* at 879, but that to sanction "free-for-all-anything-goes conduct" would "bring chaos, not peace to employer-employee relations." *Id.* This employee seeks an award from employer-generated funds for violating a negotiated agreement designed to ensure labor peace for the term of the contract. The parties to the agreement had provided procedures for the settlement of disputes without resort to lockout or strike. To adopt a policy that would encourage such conduct would endanger the concept of collective bargaining and discourage the maintenance of industrial peace.

A related and compelling interest, which we judicially note has been the subject of feverish state activity, is to enhance employment in Iowa by retaining industry and by enticing industry to relocate here. This goal is thwarted by a hostile atmosphere in which employees discharged for misconduct nonetheless are paid unemployment benefits from funds extracted from employers. *Hodory*, 431 U.S. at 490, 97 S.Ct. at 1909, 52 L.Ed.2d at 529, underscores this concern:

> The unemployment compensation statute, however, touches upon more than just the recipient. It provides for the creation of a fund produced by contributions from private employers. The rate of an employer's contribution to the fund varies according to benefits paid to that employer's eligible employees. Any action with regard to disbursements from the unemployment compensation fund thus will affect both the employer and the fiscal integrity of the fund.

(Citation omitted.) Clearly, a state policy awarding benefits to an employee who

causes plant disruptions by publicly calling for a wildcat strike in violation of an express provision of a labor agreement will do little to retain or attract employment-producing enterprises.

A factor in this balancing equation is the type of speech involved in this case. The employee's right to publicly criticize or condemn his employer or his union is not implicated by this decision. Only his activity in calling for a wildcat strike in violation of his agreement, coupled with the resulting disruption to the employer's operations, is found to be misconduct disqualifying him from benefits. Such contract-violating speech involving a subject of little public interest, balanced against the state's compelling interests in the fiscal integrity of its insolvent compensation fund, in collective bargaining and industrial peace, and in retaining and attracting industry so as to enhance employment opportunities in Iowa, does not and should not trigger a constitutionally mandated protection.

Although the employee has asserted violation of both the federal and state constitutions, his brief acknowledges "no distinction as to their substantive requirements is made for the purposes of this argument." Accordingly, our analysis is deemed sufficient under both constitutions.

We hold the employee was discharged for misconduct. He is subject to a limited disqualification for unemployment benefits under the provisions of 96.5(2)(a). This proceeding is remanded to district court for ruling in conformance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

All Justices concur except HARRIS and McCORMICK, JJ., who concur in division I through division III(A) and the result.