**G.A. AALBERS, et al., Appellants,**

v.

**IOWA DEPARTMENT OF JOB SER-VICE n/k/a Department of Employment Services, Department of Inspection and Appeals, Employment Appeal Board and Geo. A. Hormel & Company, Appellees.**

No. 87–1547.

Supreme Court of Iowa.

Nov. 23, 1988.

Arthur C. Hedberg, Jr. and Mark T. Hedberg, Des Moines, and Charles Orlove, Chicago, Ill., for appellants.

Blair H. Dewey, Des Moines, and William C. Whitten, for appellee Employment Appeal Bd.

Timothy G. Costello and Kevin J. Kinney of Krukowski & Costello, S.C., Milwaukee, Wis., James W. Cavanaugh of Geo. A. Hormel & Co., Austin, Minn., and Richard C. Bauerle of Johnson, Bauerle, Hester & Walters, Ottumwa, for appellee Geo. A. Hormel & Co.

Russell L. Samson and Elaine M. Brown of Dickinson, Throckmorton, Parker, Mannheimer & Raife, P.C., Des Moines, for amicus curiae Iowa Association of Business and Industry.

LARSON, Justice.

In August 1985, Local P–9 of the United Food and Commercial Workers Union (UFCW) went out on strike at the Austin, Minnesota, plant of George A. Hormel and Company. Soon afterwards, in an apparent attempt to put further pressure on Hormel, members of the Austin union picketed Hormel's Ottumwa, Iowa, plant. The Ottumwa plant was not a party to the labor dispute affecting the Austin plant; nevertheless, several hundred members of the Ottumwa local, including these claimants,

refused to cross the picket line. The management of the Ottumwa plant advised them that they were in violation of their collective bargaining agreement and warned them that continued refusal to work would result in their termination. Some returned, and those who did not were fired.

Approximately 500 of the fired employees applied for unemployment compensation under Iowa Code chapter 96 (1985). Hormel resisted the claims on the ground that the employees had been fired for misconduct and thus were not entitled to benefits. *See* Iowa Code § 96.25(2) (1985). A Job Service representative ruled against the claimants. Following appeal proceedings within Job Service, which resulted in denial of compensation, the claimants petitioned for judicial review. The district court ruled against the claimants, who appealed. We affirm.

When the Austin local failed to reach a bargaining agreement at the Hormel plant in Austin, it sought authorization from its parent union, UFCW International, for a strike sanction. The president of the international responded, stating:

> Your request for strike sanction against George A. Hormel and Co.'s Austin, MN plant is granted to Local 9. Because of the history preceding this sanction, let me make it clear that only strike sanction is granted; it is granted only regarding the Austin plant; neither boycott sanction nor sanction to extend the picket lines to other operations has been requested and neither is granted.
>
> . . . .
>
> While we will not today answer unanswered questions, with recent history in mind I can tell you that any request to carry Austin's dispute to other locals will have to meet a heavy burden of justification regarding the economic and legal repercussions.

In October 1985, the Hormel plant at Ottumwa notified the union by letter that it considered its contract with the Ottumwa workers to be valid and enforceable and that it interpreted the contract to prohibit any type of strike activity, including sympathy strikes. Hormel advised the workers that it retained the right to discipline any of them who might honor an Austin picket line at the Ottumwa plant.

In mid-January 1986, the Austin local requested expanded strike authorization. It also specifically requested the international union to grant its request for a sanction extending its picket lines to the Ottumwa plant. The president of the international union replied immediately, stating:

> I will not sanction extension of P–9's picket lines to other Hormel plants. And, as much as I believe in the sanctity of a picket line, I cannot in good conscience urge other Hormel members to risk their jobs to respect an unsanctioned picket line in a hopeless cause.

Officers of the Ottumwa local testified that they had notice of the parent union's refusal to sanction an extension of the strike, and a story about the refusal was published by the local newspaper in Ottumwa.

In the early morning of January 21, before Ottumwa's first shift began, pickets from Austin arrived at the plant. Approximately eighty-five percent of the first shift initially refused to cross the picket line, although they reported for work later in the day. On January 22, the local newspaper quoted the union local's president as stating, "the picket lines are unauthorized by the international. We're going to have a lot of discharges over this."

On January 23, Hormel sent a letter to all employees who had honored the picket line, warning that "the company reserves its right to use immediate termination and permanently replace any employees based on the facts and circumstances which may exist."

On January 27, the Austin employees again picketed the plant, and less than 100 of the 800 scheduled workers appeared for work. The company then sent telegrams to local and regional offices of the union asking it to confirm that the Ottumwa picketing was not authorized. The union did not respond. The next day, January 28, Hormel's plant manager made a radio appeal to all employees to return to work and stated that they had until midnight to do

so. Following the radio warning, eighty-five additional employees showed up for work, but the rest continued to honor the picket line. Approximately 500 employees who had honored the Austin pickets signed prepared forms which stated:

I (name) am notifying the Hormel Co. that I am not resigning. I am, according to Section 6.2 of the contract, choosing to honor the authorized picket line that is at the Ottumwa plant gate.

Soon after the forms were presented to Hormel's personnel manager, termination letters were sent to all employees participating in the work stoppage.

On February 21, the Austin pickets left, and several hundred of the fired Ottumwa employees marched to the plant entrance, where representatives of the union requested reinstatement of all of the discharged employees. The plant manager refused.

These claims for unemployment compensation followed. The claims were initially denied by a Job Service representative, and the claimants appealed. A consolidated hearing was held then before the Job Service chief hearing officer, who reversed the initial determination and awarded unemployment benefits. The company appealed the hearing officer's ruling, and the Job Service appeal board reversed the hearing officer, disallowing benefits. The claimants appealed to the district court, which affirmed.

The claimants argue on appeal that (1) the National Labor Relations Act preempted jurisdiction because a collective bargaining agreement was involved; (2) there was insufficient evidence to support the board's findings of misconduct; and (3) the court erred in its finding of fact that the claimants could not have had a good faith belief that they had a contractual right to strike.

## I. *The Preemption Argument.*

When a dispute arises over a matter in which the primary and exclusive jurisdiction lies in the National Labor Relations Board, we must defer to that board. *See generally San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775, 782 (1959) ("When

the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting."); *Hollander v. Peck,* 261 N.W.2d 507, 509 (Iowa 1978).

In the present case, two sections of the parties' collective bargaining contract are involved. The first, section 3.5, provides:

The Union in its behalf and on behalf of the employees agrees that during the life of this Agreement, there shall be no strikes, slowdowns, refusals to or interferences with work, sympathy strikes or refusals to work, or picketing by the Union or the employees. No officer or representative of the Union shall authorize, aid or condone any such activity, and no employee shall participate in any such activity.

The second, section 6.2, provides:

It is agreed that in the event an authorized picket line is in effect at the entrance to the plant, the Company shall not discipline employees who choose to honor such picket line. The Union agrees to use whatever influence they possess to remove such picket line from the plant.

The claimants contend that, since interpretation of these contract provisions is required, the state has no jurisdiction to adjudicate the parties' rights.

The general rule of preemption does not apply, however, in cases "where the regulated conduct touche[s] interest[s] so deeply rooted in local feeling and responsibility that, in the absence of compelling Congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." *San Diego Bldg. Trades,* 359 U.S. at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 782.

The Supreme Court has recognized such an exception in state unemployment compensation cases. *See, e.g., New York Tel. Co. v. New York Labor Dep't,* 440 U.S. 519, 540–46, 99 S.Ct. 1328, 1341–44, 59 L.Ed.2d 553, 569–72 (1979). The issue in *New York Telephone Co.* was whether the

National Labor Relations Act preempted the jurisdiction of the states in the exercise of their power to regulate unemployment benefits to strikers. In holding that it did not, the Court stated that "the silence of Congress in 1935 actually supports the contrary inference that Congress intended to allow the States to make this policy determination for themselves." *Id.* at 540, 99 S.Ct. at 1341, 59 L.Ed.2d at 569. The Court further stated that

> [u]ndeniably, Congress was aware of the possible impact of unemployment compensation on the bargaining process. The omission of any direction concerning payment to strikers in either the National Labor Relations Act or the Social Security Act implies that Congress intended that the States be free to authorize, or to prohibit, such payments.

440 U.S. at 544, 99 S.Ct. at 1343, 59 L.Ed.2d at 571 (footnote omitted). A similar view of preemption was expressed in *Baker v. General Motors Corp.*, 478 U.S. 621, 633–38, 106 S.Ct. 3129, 3136–39, 92 L.Ed.2d 504, 516–19 (1986), which held that a state's denial of unemployment compensation to strikers who had helped finance a strike was not preempted by the National Labor Relations Act.

We reject the claimants' preemption argument and, based on the above authorities, hold that the board and the district court had jurisdiction to determine the claimants' eligibility for unemployment compensation benefits.

## II. *The Evidence of Misconduct.*

The employer, Hormel, contends these claimants are precluded from recovery of unemployment compensation because they were guilty of misconduct. *See* Iowa Code § 96.5(2). Misconduct, in this context, is defined as

> a deliberate act or omission by a worker which constitutes a material breach of the duties and obligations arising out of such worker's contract of employment. Misconduct as the term is used in the disqualification provision as being limited to conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of employees, or in carelessness or negligence of such degree of recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, *or good faith errors in judgment or discretion are not to be deemed misconduct within the meaning of the statute.*

370 Iowa Admin.Code 4.32(1)(a) (now found at 345 Iowa Admin.Code 4.32(1)(a)) (emphasis added).

Section 6.2 of the collective bargaining agreement provides that the employees may not be disciplined for participation in an "authorized" strike. These claimants argue that the use of the word "authorized" must be interpreted to mean that, if they had a "good-faith belief" that the strike was authorized, they could not be deemed guilty of misconduct based on the "errors in judgment" language in the quoted rule. They argue that employees who honored the picket line "did so in the honest and well-grounded belief" that they could do so under the collective bargaining agreement.

The appeal board considered the misconduct issue at length, and ruled that the claimants were guilty of misconduct on three separate grounds: (1) excessive absenteeism; (2) unauthorized strike participation; and (3) failing to use the dispute resolution procedures provided by their collective bargaining agreement.

In finding misconduct on the second ground, unauthorized strike participation, the board specifically considered and rejected the "good-faith belief" argument now urged. The question now is whether substantial evidence supports that finding.

In *Heatherly v. Iowa Department of Job Service,* 397 N.W.2d 670, 670 (1987), we

discussed the scope of review in these cases:

In several recent judicial review decisions we have emphasized that the district court and our appellate courts are not permitted to and should not review de novo the record made before the agency. *Hussein v. Tama Meat Packing Corporation,* 394 N.W.2d 340, 341 (Iowa 1986); *Hurtado v. Iowa Department of Job Service,* 393 N.W.2d 309, 311 (Iowa 1986); *Harlan v. Iowa Department of Job Service,* 350 N.W.2d 192, 193 (Iowa 1984); *Higgins v. Iowa Department of Job Service,* 350 N.W.2d 187, 190 (Iowa 1984). The final agency decision in a "contested case" (Iowa Code § 17A.2) should be affirmed by the district court and our appellate courts when there is no error of law and the decision is supported by substantial evidence in the record as a whole. *See* Iowa Code § 17A.19(8)(f) (1985).

■ Substantial evidence is "that which a reasonable mind would accept as adequate to reach a given conclusion, even if a review[ing] court would have drawn a contrary inference from the evidence." *Messina v. Iowa Dep't of Job Serv.,* 341 N.W.2d 52, 59 (1983); *Iowa Health Sys. Agency, Inc. v. Wade,* 327 N.W.2d 732, 733–34 (Iowa 1982). Evidence is substantial when a reasonable mind could accept it as adequate to reach the same findings. *Norland v. Iowa Dep't of Job Serv.,* 412 N.W.2d 904, 913 (Iowa 1987). The fact that an agency could have drawn two inconsistent conclusions from the evidence presented does not mean that the conclusion it chose is unsupported by substantial evidence. *Anthon–Oto Community School Dist. v. PERB,* 404 N.W.2d 140, 142 (Iowa 1987).

We hold that the board's finding of misconduct by the claimants, based on their refusal to work in the face of overwhelming evidence that the strike was unauthorized was supported by substantial evidence. In view of our holding on this ground, we do not address the additional two bases of misconduct found by the board, *i.e.,* excessive absenteeism and failure to resolve the dispute according to the collective bargaining agreement.

### III. *The "Good–Faith" Issue.*

■ Claimants contend that the district court exceeded its authority in considering and rejecting their "good-faith belief" argument, because no specific finding on it had been made by the appeal board. The district court said:

None of these reasons would constitute statutory misconduct if the petitioners actually had a good-faith belief that they were acting within the bounds of their contracts of employment. The hearing officer determined that the employees did have such a belief. *The Appeal Board did not directly address the issue in its opinion.*

(Emphasis added.)

Notwithstanding this observation by the district court, Hormel argues that the board had in fact addressed the claimants' "good-faith belief" theory, although the board did not call it by that name. Hormel also contends that "good-faith belief" is a phrase manufactured by the claimants and that it has no basis in the statute or the board's rules. (Iowa Code section 96.5(2) mentions "misconduct in connection with the individual's employment" but does not mention a "good-faith" exception; 370 Iowa Administrative Code 4.32(1)(a) refers only to "good faith errors in judgment or discretion.")

In its ruling, the appeal board discussed the employees' claim that they believed they had the right to strike under their collective bargaining agreement. Although the claim was not characterized by the board as a "good-faith" defense, it is clear that that is what it was, and the defense was expressly rejected by the board.

The district court on judicial review also rejected this defense. In doing so, it said:

In view of all the facts and circumstances, the Court cannot say that the Appeal Board erred in finding that the petitioners should be denied benefits. *A reasonable person in petitioner's place would not have had a good faith belief that he*

*or she had a contractual right to honor the P–9 picket.*

(Emphasis added.) This raises a significant question: Is the test for good faith a subjective or objective test? The claimants argue that it is the former—that each claim for compensation must be weighed against the individual claimant's subjective belief as to whether he or she had the right, under the collective bargaining agreement, to refuse to work. They apparently concede their acts were "deliberate acts or omissions" under the rule, but they argue that the good-faith defense must nevertheless be considered on an individual, subjective basis.

The Supreme Court has considered the issue in analogous cases. In *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), for example, the Court construed a "good faith" quitting provision in the Labor Management Relations Act. In reversing a determination equating "good faith" with an employee's "honest belief," the Court held that a union invoking the "good-faith" provision "must present 'ascertainable, *objective* evidence supporting its conclusion.'" *Id.* at 387, 94 S.Ct. at 641, 38 L.Ed.2d at 597 (emphasis added). The Court found an objective test consistent with legislative intent and "common sense." *Id. See also Harlow v. Fitzgerald*, 457 U.S. 800, 815–20, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396, 408–412 (1982) ("good-faith" immunity of governmental officials in civil rights damages actions judged by strictly objective test); *Bellwood Gen. Hosp., Inc. v. NLRB*, 627 F.2d 98, 102 (7th Cir.1980) (claim of "good-faith doubt" in employer's refusal to bargain with established union must satisfy objective test although subjective evidence may be used to bolster employer's argument); *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 299 (9th Cir.1978) (employer's good-faith challenge of union majority is unconcerned with employer's subjective motivation; focus is instead empirical and objective); *Peerless of Am., Inc. v. NLRB*, 484 F.2d 1108 (7th Cir.1973) (a violation upon employer's good-faith refusal to bargain has nothing to do

with employer's subjective motivation for that refusal).

In *Therrien v. Maine Employment Security Commission*, 370 A.2d 1385 (Me. 1977), the Maine Supreme Court held that an objective test should be used to determine an employee's "good-faith belief" as to his right to refuse his employer's order. In *Therrien*, unemployment compensation claimants had been fired because they had refused to participate in their employer's trial program to determine whether efficiency could be improved in the factory. The superior court found the claimants were not guilty of misconduct as a matter of law.

In reversing the superior court, the Maine Supreme Court held that the good faith of the mill workers in refusing to participate in the employer's trial program was not a proper basis for disposition of their claims. *Id.* at 1389. It added that

> [s]incerity of belief is too subjective a concept to serve satisfactorily as the sole basis for determining a discharged employee's status under the statute. Cases can be easily imagined where an employee's behavior is in fact grounded upon some sincere but irrational belief and where the behavior may be properly deemed misconduct within subsection 23. At a minimum, whatever belief an employee asserts as the reason for his conduct should be measured against a standard of reasonableness under all the circumstances.

*Id.*

Similarly, in *Williams v. Burlington Industries, Inc.*, 318 N.C. 441, 349 S.E.2d 842 (1986), the North Carolina Supreme Court held that the proper test was an objective one, stating that

> [a]lthough an employee's intentions are certainly relevant in either event, the correct standard is the objective "good cause" rather than the subjective "good faith cause."

*Id.* at 851.

We agree with these authorities. The subjective understanding and intent of the claimants are relevant on the question of misconduct, but they are not the end of the

**336**

inquiry. The key question is what a reasonable person would have believed under the circumstances. We conclude that the board properly applied this test and that its conclusion was sustained by substantial evidence.

We therefore affirm the denial of unemployment compensation benefits.

AFFIRMED.

All Justices concur except McGIVERIN, C.J. and CARTER, J. take no part.