## SPRAGUE ELECTRIC COMPANY
### v.
## MAINE UNEMPLOYMENT INSUR-ANCE COMMISSION.

Supreme Judicial Court of Maine.

Argued May 13, 1988.
Decided July 5, 1988.

David M. Felper (orally), Bowditch & Dewey, Worcester, Robert H. Furbish, Smith & Elliot, Saco, for plaintiff.

James E. Tierney, Atty. Gen., L. Louise Smith (orally), Asst. Atty. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

SCOLNIK, Justice.

The defendant, the Maine Unemployment Insurance Commission ("the Commission"), appeals from a judgment entered in the Superior Court, York County, sustaining the appeal of the plaintiff, Sprague Electric Company ("Sprague"), brought under M.R. Civ.P. 80C. Sprague had appealed from a decision of the Commission awarding unemployment compensation to a former employee, Linda Woodward.

Sprague manufactures electrical components at its plant in Sanford. Woodward was employed by Sprague from January 19, 1973 until January 17, 1986. Originally hired as a reeling machine operator, a position she held for more than seven years, Woodward was then promoted to the position of mechanic in the finishing department. As a finishing mechanic working the day shift, she was responsible for servicing as many as eight reeling machines. A reeling machine measures, straightens,

and packs parts for electrical components for shipping purposes. Each reeling machine is tended by an operator.

Woodward's job as a mechanic required her to order parts for machines as well as to repair reeling machines. Mechanics received notices of machines in need of repair by consulting a blackboard on which machine operators listed machines that had broken down and gave the time of entry. Machines were repaired by mechanics in the order that notices were entered on the board.

In addition to her duties as a mechanic, Woodward was responsible for "set-up utility" in the production room. This job involved insuring that the production room never ran out of stock for the machines. Woodward ordered supplies and stock, picked up the ordered items from the stockroom and put away the stock. Performance of her duties as utility set-up required approximately seven hours per week.

During the period of August, 1985 to January, 1986, production at Sprague declined. This decline led to lay offs in the finishing department. By January, 1986, the department staff had been reduced to the point where two operators worked on six reeling machines where previously eight operators worked on eight machines. Although no operator worked on more than one machine at a given time, Woodward was responsible for keeping all six machines in working order.

Machine operators earned a higher rate of pay depending on whether their machines were running or were "down" (off production). When machines were running, operators had an opportunity to obtain a bonus rate for increased production. When a machine was down, the machine operator received only a flat hourly rate of pay. Specifically, an operator would only receive a flat rate of $5.00 per hour if a machine was not running or only running erratically. However, if a machine was running fairly well, the same operator would receive a bonus and could earn around $9.00 per hour. Consequently, Steve Griffin, the general foreman, testified that "there's a lot of pressure" on the

mechanics to keep the machines operating. Throughout 1985, Sprague began to phase out its reeling machines while increasing the use of integrated line machines, which incorporate the function of reeling machines. Integrated line machines perform five functions—straightening, stamping, heating, drying, and sleeving, followed by reeling. A reeling machine is fairly small and compact as compared to an integrated line machine, which Woodward described to the Commission to be "as long as this [hearing] room." The reeling machine component is built onto the end of an integrated line machine. By January, 1986, Sprague had fifteen integrated lines in operation, with five mechanics tending them.

In October of 1985, Woodward began to work four-day rather than five-day weeks. Although Woodward was senior to other mechanics, those mechanics were working full, five-day weeks because they had received formal training on integrated line machines as well as reeling machines. By the time of her separation from employment, Woodward had already worked ten four-day weeks.

Between August, 1985 and January, 1986, Woodward was encouraged by her supervisor to use her "spare time" to become trained on the integrated line machines. It is unclear from the record how often she was able to find time for such training since such opportunities arose only as her regular duties permitted. Woodward attempted to train on the integrated lines in this manner throughout the latter part of 1985.

On one occasion Woodward applied for and obtained permission to work on the integrated lines on the third shift (11:00 p.m. to 7:00 a.m.) and worked one four-hour period before her regular shift began. There was an experienced integrated line mechanic on duty in another department to train her during those four hours. This was Woodward's only uninterrupted training time on the machinery.

In early January of 1986, Roy Heath, finishing department foreman, decided to assign Woodward to two integrated lines in addition to her other duties. Both Heath

and Griffin felt that assigning Woodward to two of the integrated lines would force her to learn to repair this machinery. However, Heath (Woodward's immediate supervisor) was on vacation the week of January 6th when Woodward was first assigned to the integrated lines. Accordingly, she was supervised that week by Griffin, and was supposed to receive assistance and on-the-job training from the lead mechanic, Lou MacDonald.[1] It was her understanding that she was still responsible for the utility set-up as well as repairs to the six reeling machines.

On Monday, January 6, Woodward began to work on two integrated lines in addition to the six reeling machines to which she was already assigned. Woodward had been promised help in tending to her utility duties, but she received no assistance during her first week on the integrated lines. Owing to her lack of experience and training on this machinery, Woodward was unable to repair the integrated lines by herself. In addition, Woodward received many complaints from the reeling machine operators whose machines were down at various times during the week of January 6–10. The operators were upset that the machines were not being repaired by Woodward since inoperability resulted in a loss of "bonus time."

As the week progressed, more machines were down for longer periods. After Wednesday, Woodward was unable to find other integrated line mechanics to help in the repair of her two integrated lines. The other mechanics told Woodward that they felt it was not their job to train her, that it was MacDonald's responsibility. Beyond one or two hours on Monday, however, MacDonald was unavailable to supervise, train or assist her. As a result, Woodward complained to the group leader that she wasn't getting training and couldn't find the lead mechanic.

On Friday, January 10, only one integrated line was working. The other line and the six reeling machines had frequent breakdowns during the morning. Woodward testified that the other mechanics were "out straight" with their own work and would not come down to assist her. On her return from a dinner break, Woodward was asked by Griffin to go to the stockroom for reeling tape, try it on the number fifteen reeler machine, and make sure it was running properly.

After completing this task, she returned to find numerous notices on the blackboard that all her machines were down. The machine operators were angry and one operator was "screaming" at her for not having fixed their machines before working on the number fifteen reeler. All the machine operators were gathered around their group leader's desk, complaining that Griffin had given them average rates for the day with no earned bonus time. Woodward got upset, began to cry and went to the ladies' room. The group leader, Celeste St. Armand, reported to Griffin that Woodward was upset.

Griffin called Woodward into his office, where he gave her an oral warning about using vulgar language. While in Griffin's office, Woodward again expressed her dissatisfaction with the amount and method of training she had received on the integrated lines prior to being assigned to them. She complained that she was unable to repair the machines in a timely manner because of her inexperience and lack of training. Griffin told her there would be no change in her responsibilities or method of training. Griffin then asked Woodward if she still wanted to be a mechanic. Woodward said "No," and gave her notice. January 17 was Woodward's last day of work.

Following her termination on January 17, 1986, Woodward filed a claim for unemployment benefits. This claim was denied by a Deputy from the Bureau of Employment Security, based on the finding that she had left her work voluntarily without

1. Sprague's witnesses testified that the company's formal training policy for newly employed mechanics was to have them work under the supervision of a more experienced mechanic for one to two weeks. Sprague's training policy for experienced mechanics who were assigned to new machines was never clearly defined by Sprague's witnesses; it was apparently some form of loosely supervised "on-the-job" training.

good cause attributable to her employment.[2] Woodward appealed the Deputy's decision and a hearing was held before an Adjudication Officer of the Appeal Tribunal on July 22 and August 26, 1986. The Appeal Tribunal set aside the Deputy's decision, finding that Woodward had left work voluntarily with good cause attributable to her employment and was thus eligible for benefits. Sprague appealed the Appeal Tribunal decision to the Commission. The Commission held a *de novo* hearing on October 15, 1986, and affirmed the Appeal Tribunal's decision.

The employer filed a complaint in Superior Court pursuant to M.R.Civ.P. 80C seeking judicial review of the Commission's decision. The Superior Court vacated the Commission's decision, finding that the decision was not supported by sufficient evidence in the record and therefore was erroneous.

### I.

Because the Superior Court sat as an intermediate appellate court, we review the Commission's decision directly. "[This] review is limited to whether the commission correctly applied the law and whether the commission's factual findings are supported by any competent evidence." *Gerber Dental Center Corp. v. Maine Unemployment Insurance Commission*, 531 A.2d 1262, 1263 (Me.1987).

■ Sprague argues that the Commission erred as a matter of law by relying on *Toothaker v. Maine Employment Security Commission*, 217 A.2d 203 (Me.1966) in its decision. The Commission quoted *Toothaker* to support the proposition that good cause to leave employment because of pressure from the workplace exists if " 'the pressure [is] real not imaginary, substantial not trifling, reasonable not whimsical [when] the decision is voluntary in the sense that the worker has willed it, but

involuntary because outward pressures have compelled it.' " *Toothaker*, 217 A.2d at 207, quoting *Krauss v. A. & M. Karaqheusian, Inc.*, 13 N.J. 447, 100 A.2d 277, 286 (1953).

Sprague argues that *Dotter v. Maine Employment Security Commission*, 435 A.2d 1368 (Me.1981) and *Therrien v. Maine Employment Security Commission*, 370 A.2d 1385 (Me.1977) established a test that is more appropriate for this case than that used in *Toothaker*, and that would, if applied here, compel a finding that Woodward did not leave Sprague for good cause. Sprague's argument is without merit. *Toothaker's* approach to good cause has not been modified by *Dotter* and *Therrien*. Citing *Toothaker* with approval, we recently said: "Good cause exists when the pressure of real, substantial and reasonable circumstances compels the employee to leave. The employee must be forced to quit because of outward pressures." *Henry v. Maine Unemployment Insurance Commission*, 518 A.2d 1046, 1049 (Me. 1986) (citing *Toothaker*, 217 A.2d at 207). Sprague seems to imply that *Toothaker* was a more subjective test than the standard developed in *Dotter* and *Therrien*. This implication is unwarranted. The *Henry/Toothaker* test is an objective one. An employee's whim or subjective rationale will, standing alone, be insufficient proof of good cause, whether analyzed according to *Henry/Toothaker*, or *Dotter/Therrien*. Woodward's testimony, which was apparently believed by the Commission, would support the Commission's finding that:

> It was unreasonable for the employer to deny the claimant's [Woodward's] numerous requests for training. Therefore, the Commission determines that because the employer acted unreasonably by denying the claimant proper training, the claimant had good cause to leave her employment.

---

**2.** *See* 26 M.R.S.A. § 1193(1)(A) (Pamph.1987), which reads, in pertinent part:

> An individual shall be disqualified for benefits: ...
> For the week in which he left his regular employment voluntarily without good cause

attributable to that employment ... and disqualification shall continue until claimant has earned 4 times his weekly benefit amount in employment by an employer ...

■ Sprague also insists in its brief that good cause did not exist because Woodward quit "solely because she was not receiving what *she* considered to be sufficient training." (emphasis in original). This may be true, but Sprague overlooks the Commission's ultimate finding that it was reasonable under the circumstances for Woodward to expect additional training.

Sprague's selective references in its brief to testimony supporting its position ignores the rule that "[t]he court may not substitute its judgment for that of the agency merely because the evidence could give rise to more than one result." *Dodd v. Secretary of State*, 526 A.2d 583, 584 (Me.1987). The Commission's finding will be upheld if there is competent evidence to support it, notwithstanding inconsistent evidence in the record. *Id.; see also Seven Islands Land Co. v. Maine Land Use Regulation Commission*, 450 A.2d 475, 479 (Me.1982). The Commission generally chose to believe Woodward rather than Sprague's witnesses. This credibility determination was exclusively the province of the Commission and will not be disturbed on appeal. *Merrow v. Maine Unemployment Insurance Commission*, 495 A.2d 1197, 1201 (Me. 1985); *W.S. Libbey Co. v. Maine Employment Security Commission*, 446 A.2d 42, 44 (Me.1982).[3]

Woodward's testimony was sufficient to support the Commission's finding that "it was completely unreasonable for [Sprague] to provide [Woodward] with but two (2) hours training on integrated line machines and expect her to be responsible for repairs on two of these machines all by herself." Woodward was put in a position where, if she continued her futile and unsupervised attempts to repair the integrated line machines, she would be laying the foundation for an eventual demotion or discharge. This evidence amply supports the Commission's finding that this was objectively unreasonable behavior on the part of Sprague. In particular, the Commission's finding that Woodward only received two hours training from Sprague on the integrated line machines is supported in the record. Woodward testified that the indeterminate amount of training time she had been given on the integrated lines prior to January, 1986, such as the four hour overtime shift she worked, was due entirely to her own efforts, and was not formal "on-the-job" training given by Sprague. Moreover, the previous "training" Woodward had independently obtained amounted to no more than Woodward observing some mechanics on the integrated lines and the one four-hour overtime shift, during which Woodward was assisted and supervised by an experienced integrated line mechanic.

In addition, Sprague suggests that if Woodward is allowed to collect unemployment benefits, this could lead to *en masse* departures by employees whose demands for specific training are not met. This argument is unavailing. Sprague fails to recognize that Commission decisions are highly fact-specific and will be determined by the circumstances in a particular case. Even if Sprague's assertion in this regard was a relevant consideration to the outcome of this case, it is questionable indeed that affirmance of the Commission's decision would result in a mass exodus of employees as suggested.

Sprague also contends that the Commission's decision contained many factual errors. Because the Commission chose to disregard much of the testimony of Sprague's witnesses, upon which Sprague relies in support of its claim, we find this point to be without merit.

## II.

■ Sprague alleges that because Woodward refused an offer of suitable employment from Griffin, her foreman, she should be disqualified from receiving unemploy-

---

3. In its brief, Sprague criticizes Woodward's testimony because she was inconsistent in describing the particular days she was able to get help from other mechanics during her first week on the integrated lines. Apparently, the Commission did not consider this discrepancy in Woodward's testimony to be fatal to her credibility. "[S]uch conflicts [in a witness's] testimony are for the fact finder to resolve." *Bean v. Maine Unemployment Insurance Commission*, 485 A.2d 630, 634 (Me.1984).

ment compensation.[4] Sprague claims that Griffin offered Woodward a position as a mechanic during their discussion in Griffin's office.

Griffin testified before the Commission that he offered an operator's position to Woodward. However, he apparently did not mention this alleged offer in his earlier testimony before the Appeal Tribunal. More significantly, Woodward could only recall Griffin asking her if she "still wanted to be a mechanic" when she complained to Griffin about her lack of training and after Griffin had refused to change the conditions under which she was being trained. The Commission apparently chose again to believe Woodward over Griffin as to this aspect of the exchange that took place between them in Griffin's office. This credibility determination was one to be made *exclusively by the Commission and will not be disturbed by this court on ap-*peal. We have carefully examined the other arguments offered by Sprague and find them all to be without merit.

The entry is:

Judgment vacated.

Remanded to the Superior Court for entry of judgment affirming the decision of the Maine Unemployment Insurance Commission.

All concurring.

---

**4.** *See* 26 M.R.S.A. § 1193(3) (Pamph.1987):
An individual shall be disqualified for benefits: ...

For the duration of his unemployment subsequent to his having refused to accept an offer of suitable work for which he *is* reasonably fitted ...