STATE OF MAINE

YORK, ss.

SUSAN M. SIMPSON,

Petitioner

v.

MAINE UNEMPLOYMENT
INSURANCE COMMISSION,

Respondent

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-00-086

**ORDER**

Pending is Ms. Simpson's Rule 80C appeal from a decision of the Maine Unemployment Insurance Commission. For reasons stated below, the appeal is Denied.

FACTUAL BACKGROUND

Petitioner Susan Simpson ("Claimant"), a 46 year-old American female of Puerto Rican ancestry, was hired as a manager on May 28, 1998 by Community Living Options, Inc. ("CLO"). R. 82-82.[1] CLO is a non-profit corporation that provides vocational training to people with disabilities. R. 82. Claimant's job involved overseeing and working with clients who were referred to CLO for vocational training. Specifically, Simpson was supervisor of the cleaning service and trained disabled people to clean offices, floors, toilets, etc. Simpson was also expected to perform cleaning services herself at the various job sites. R. 104.

---

[1] In addition to her brief, Simpson has filed a binder of documents entitled "Plaintiff's Record" which includes a copy of the Certified Record that the Commission filed with the Court. The Commission argues that the documents contained at Tabs 1, 4, 5, 6, 7 and 8 of Plaintiff's Record were not made a part of the administrative record and therefore should not be considered by the Court.

On March 23, 2000, CLO changed Simpson's job title to "site coordinator" so that she would no longer be responsible for going out on marketing visits. R. 101, 112-13, 180. Simpson's salary and hours remained the same. R. 112, 180.

On April 7, 2000, Plaintiff received a telephone call from the director of vocational services, informing her that there was a new assignment for cleaning services at a construction site. R. 89. On April 10, the director called Simpson to tell her that the job at the new site was scheduled for the following day. R. 104. Simpson replied that she had already scheduled a cleaning assignment at the Saco Armory and couldn't be in two places at once. R. 90, 92. The employer therefore arranged for another group to clean at the construction site. R. 90, 92, 104-05.

Simpson cleaned the Saco Armory as scheduled. R. 91-92. Simpson then called the CLO's office and left a message with the receptionist that she was resigning and was giving a two-week notice. R. 107. After she had made this phone call, Simpson went to the new construction site. The construction site assignment was a new job for CLO and was an experiment to see if CLO could handle such assignments. R. 106. In the director's opinion, the construction site was safe. R. 105-06. In Simpson's opinion, the site was not safe for her clients to clean. 92-93.

On April 12, Simpson met with the program manager for the residential division of CLO, Carlton Ming. R. 93-94. It appears that she had learned of a position opening at CLO's residential sites and hoped to transfer to that position. R. 93. However, upon meeting with Ming, she was told that the executive director of CLO had told Ming not to hire Simpson. R. 94. Later that day Simpson submitted her written resignation. R. 94-95.

2

In her letter of resignation, Simpson stated that she was leaving her job because she could not be in two places at the same time. R. 155, 178. The letter also stated that she had been given verbal notice that her position had been changed, but that she had not yet been given a new job description. R. 178.

In addition to the reasons stated in her letter of resignation, at the hearing before the Administrative Hearing Officer on June 13 and 19, 2000, Simpson stated that she felt that she was being "set up" by CLO by being put in a situation in which she was expected to work in two different places and by being asked to work at a site that she considered to be unsafe. R. 88. Simpson believed she was being set up and therefore being forced to leave because she knew too much about CLO's improper billing practices. R. 88, 101.

Simpson also reported that she left CLO because clients referred by vocational rehabilitation services often didn't have transportation so she was left cleaning the sites alone or would have to pick up clients. R. 88, 100. Simpson also testified that she was told that the more cleaning contracts CLO got, the more Simpson would "back out from cleaning" and her role would become primarily supervisory. R. 88-89. This, however, did not happen. R. 88-89. Simpson also reported that she would often needlessly receive "911" emergency pages from the CLO office while she was working.[2] R. 102.

In addition to the above stated reasons for resigning from CLO, at the August 16, 2000 hearing before the Commission, two of Simpson's witnesses testified that the executive director, Glen Alterman, used inappropriate and offensive language in the

_____

[2] At the hearing before the Commission, two of Simpson's witnesses, Sandra Jorgenson and Melissa Allen also testified about getting needless pages. R. 25-28, 45-46.

3

workplace. **R. 23-25, 41-42.** Some of this language was directed toward Simpson. **R. 23-25, 41-42.**[3]

After Simpson resigned she applied for unemployment benefits and was denied in a deputy decision that determined she had voluntarily left her employment without good cause attributable to that employment. **R. 176.** Simpson appealed and on July 18, 2000, an Administrative Hearing Officer issued a decision denying Simpson benefits after finding that she left her employment voluntarily without good cause directly related to her working conditions. **R. 74-78.** Simpson appealed this decision to the Maine Unemployment Insurance Commission (the "Commission"). Prior to the Commission hearing, CLO notified the Commission that it was no longer contesting Simpson's claim and would not participate in the hearing. **R. 5, 60.** On September 7, 2000, a majority of the Commission affirmed and adopted the decision of the Administrative Hearing Officer with additions and modifications. The Commission found that Simpson did not leave work voluntarily with good cause attributable to such employment because Simpson: (i) did not suffer real and substantial pressures that compelled her to leave her employment and; (ii) did not make CLO aware of her concerns prior to resigning. **R. 1-3.** Simpson now appeals this decision.

---

[3] Plaintiff's Brief , p.17, states that "each of the three hearing bodies in this case completely ignored or glossed over a very serious aspect of this case; to wit: the nature of the "name calling" and by whom utilized. Claimant's supervisor directed the most vile and filthy racial and ethnic slurs at Claimant and other minority employees." However, Simpson did not raise the issue of name calling until the Commission hearing. Although two of her witnesses testified about the offensive language, Simpson herself did not indicate that she left CLO because of inappropriate language. See infra.

4

# DISCUSSION

## 1. Standard

In reviewing a decision of the Maine Unemployment Insurance Commission, the Court reviews the administrative record to determine whether the Commission correctly applied the law and whether its fact findings are supported by any competent evidence. McPherson Timberlands, Inc. v. Maine Unemployment Insurance Commission, 1998 ME 177, ¶ 6, 714 A.2d 818, 820. This Court will not disturb a decision of the Commission "unless the record before the Commission compels a contrary result." Id. The fact that the record contains inconsistent evidence or that inconsistent conclusions could be drawn from the record does not prevent the agency's findings from being sustained if there is substantial evidence to support them. Seven Islands Land Co. v. Maine Land Use Regulation Commission, 450 A.2d 475, 479 (Me. 1982). "The burden of proof clearly rests with the party seeking to overturn the decision of an administrative agency." Id.

## 2. Good Cause Attributable to Employment

The Employment Security Act provides that an individual is temporarily disqualified from receiving benefits "[f]or the week in which the claimant left regular employment voluntarily without good cause attributable to that employment." 26 M.R.S.A. § 1193(1)(A). In this case there is no dispute that Simpson left her employment voluntarily. The issue before the Court is whether she had good cause within the meaning of § 1193(1)(A) to leave her employment.

Simpson bears the burden of proving that she resigned for good cause attributable to her employment. Spear v. Maine Unemployment Insurance Commission, 505 A.2d 82, 84 (Me. 1986).

5

The Law Court has held that good cause for voluntarily resigning exists when "[t]he pressure of real not imaginary, substantial not trifling, reasonable not whimsical, circumstances *compel* the decision to leave employment." Id. Good cause must be measured against a standard of reasonableness under all the circumstances. Id.

The Commission found that Simpson did not suffer real and substantial pressures that compelled her to leave her employment. R. 2. This finding is supported by the record. At the time Simpson left her job, she stated that she was leaving because she "couldn't be in two places at once" and because the construction site CLO had scheduled her to work at was unsafe. R. 87-88. However, this scheduling conflict was resolved in Simpson's favor - CLO told her that she did not have to report to the construction site and arranged for someone else to handle the job. Simpson reported to the job that she had scheduled. She was not required, therefore, to work at a site that she considered to be unsafe.[4] In addition, Simpson has acknowledged this was the only scheduling conflict she had encountered while working at CLO. R. 99.

Simpson also stated that she left her employment because her job position had changed, but she had not been given a new job description. The record indicates that Simpson's job title changed from manager to site coordinator on March 23, 2000, approximately three weeks before she resigned. Her salary and hours did not change.

---

[4] In any event, the Administrative Hearing Officer found the employer's testimony credible that the construction site was safe. R. 76. Credibility determinations are "exclusively the province of the Commission and will not be disturbed on appeal." Sprague Electric Co. v. Maine Unemployment Insurance Commission, 544 A.2d 728, 732 (Me. 1988).

In addition, it appears that Simpson resigned before she had even seen the site. R. 107. The Hearing Officer concluded that ". . . the assignment was not a reason why she resigned. Rather it was a reason added later." R. 76.

R. 112, 180. It appears that Simpson's duties and responsibilities remained the same after the change in job title, with the exception that she was no longer responsible for "site reviews" which involved obtaining new contracts for CLO. R. 111-13.

At the hearing before the Administrative Hearing Officer, Simpson raised other problems she had with her employer, namely, the lack of transportation for clients and needless "911" pages. At the hearing before the Commission, in addition to the aforementioned concerns, for the first time Simpson raised the issue of offensive language used at the workplace. At the Commission hearing, two of Simpson's witnesses testified that Simpson was occasionally the target of such language. R. 23-25, 41-42. However, Simpson herself did not indicate that she resigned because of offensive language. R. 50-51. The above issues raised by Simpson do not establish that she suffered real and substantial pressures that compelled her to resign from CLO.

In addition, the Commission found that Simpson did not make any of her concerns known to CLO prior to her resignation, and therefore CLO did not have the opportunity to remedy Simpson's concerns. R. 2. See Merrow v. Maine Department of Manpower Affairs, 495 A.2d 1197, 1201 (Me. 1985)(stating that the employer must be given an opportunity to change the offensive conditions). CLO did have a grievance policy. R. 183. Claimant received a copy of this manual. R. 181. However, there is no evidence in the record regarding Simpson approaching her employer to discuss her concerns. R. 107 (and record generally). The Commission's finding is therefore supported by the record.

For the above reasons, the Commission's finding that Simpson did not leave work voluntarily with good cause attributable to her employment should be affirmed.

### 3. Due Process

The Law Court has held that "[t]he essential requirement of due process in the administrative context is that a party be given notice and an opportunity to be heard." Martin v. Maine Unemployment Insurance Commission, 1998 ME 271, ¶ 15, 723 A.2d 412, 417. Simpson raises various due process arguments including alleged defects in the notices of hearing and conducting the hearings by telephone.

First, Simpson argues that the notice of hearing was inadequate because it did not apprise her of her right to representation by an attorney. However, there were three notices of hearing issued in this matter. R. 62, 166, 175. The hearing notice for the hearing before the Commission as well as the two hearing notices issued by the Division of Administrative Hearings specifically state that the claimant may be represented by an attorney.

Simpson's argument that the telephonic hearings denied her due process is also without merit. Simpson argues that the telephonic hearings denied her due process because she was unable to confront the witnesses in person and because the Commission could not adequately make credibility determinations in a telephone hearing. "[I]n the administrative arena, due process requirements are flexible and entail no specific form of procedures." Town of Vienna v. Kokernak, 612 A.2d 870, 874 (Me. 1992). There is no requirement in an administrative proceeding that a party be afforded the opportunity to confront the opposing party in person. In this case, Simpson was given two hearings, gave testimony, presented witnesses and cross-examined CLO's witnesses. Simpson was therefore provided with an opportunity to fully participate in the hearings and present her story and arguments.

Simpson's argument that the telephone hearing denied the Hearing Officer and the Commission the opportunity to make credibility determinations is also without merit. Observing physical appearance and demeanor is not the sole means of determining credibility. "[O]f equal or greater importance is what a witness says and how she says it." Babcock v. Employment Div., 696 P.2d 19, 21 (Or. App. 1985). Simpson did not object to the form of the hearing and did not express any concern regarding her ability to present her case. In short, there is nothing in the record indicating that Simpson was prejudiced in any way by the telephonic hearing.

Simpson's final argument that the State does not have a compelling interest in pursuing this case when the employer is no longer contesting the claim is without merit. The Commission has an obvious interest in ensuring that the Employment Security Law is administered fairly and properly.

The entry will be as follows:

Appeal Denied.

The clerk may incorporate this order in the docket by reference.

Dated:　　　October 1, 2001

PETITIONER:　Frederick D. Williams, Esq.
　　　　　　　PO Box 756
　　　　　　　Windham Me 04062

G. Arthur Brennan
Justice, Superior Court

RESPONDENT:　Pamela W. Waite AAG
　　　　　　　6 State House Station
　　　　　　　Augusta Me 04333-0006