STATE OF MAINE                      BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                      Location:  Portland
                                    Docket No.:  BCD-AP-11-11
                                    AM4 - CUM - 1/18/2012

PAUL A. DYER,                       )
                                    )
                                    )
              Petitioner,           )
                                    )
       v.                           )
                                    )
SUPERINTENDENT OF INSURANCE,        )
                                    )
              Respondent            )
                                    )

## DECISION ON RULE 80C APPEAL

Petitioner Paul A. Dyer appeals from a decision of Respondent Superintendent of Insurance in which the Superintendent found that Dyer violated numerous provisions of the Insurance Code in the course of an annuity transaction with Joan Van Horn. (Administrative Record (hereinafter, "A.R.") 205-06.) As a result, the Superintendent revoked Dyer's insurance producer license and insurance consultant license and ordered him to pay restitution to Van Horn and a fine of $5500. (A.R. 198.)

*FACTUAL BACKGROUND*

Dyer has been licensed by the Bureau of Insurance since 1982 and, at the time of these proceedings, held a Resident Insurance Producer License and a Resident Insurance Consultant License. (A.R. 198.) Dyer met Van Horn in the fall of 2004 after Dyer gave a speech on long term care protection at the Augusta Civic Center. (A.R. 198.) Dyer and Van Horn had several meetings and Van Horn decided to apply for long-term care insurance, but she was denied coverage on a medical basis. (A.R. 198.) After the denial of coverage, Van Horn signed a

1

Consultant Agreement with Dyer on January 18, 2005, engaging Dyer to review her insurance, financial, and estate plans and advise her on her current plans or needs. (A.R. 199.)

According to Dyer, he created a four-part plan to guarantee Van Horn an income stream so that she could safely reinvest her assets in other tools with a higher yield and pass her estate to her heirs. (A.R. 199.) The plan, however, was never reduced to a single document and was only communicated to Van horn orally; the Superintendent concluded that the full four-part plan was not adequately documented or explained to Van Horn. (A.R. 199-200.) The only part of the alleged four-part plan that was completed was the purchase of a single-premium immediate annuity (SPIA) from Old Mutual Financial Network[1] (Old Mutual) through a section 1035 tax-free partial exchange. *See* 26 U.S.C.S. § 1035(a)(3) (LexisNexis 2011). (A.R. 200.)

When Dyer and Van Horn met, Van Horn held an annuity through Modern Woodmen of America with a value of $143,818.58; a base interest rate of 5.45%; a guaranteed rate of 4.00%; and additional credited interest rate of 0.25% on balances over $100,000. (A.R. 200.) Van Horn received a monthly withdrawal of $550. (A.R. 200.) On Dyer's advice, Van Horn surrendered a portion of the Modern Woodmen annuity and applied for a SPIA. (A.R. 200.) Dyer did not review the application with Van Horn personally, and Van Horn did not know or understand what a SPIA or a section 1035 exchange was. (A.R. 200.)

There was conflicting testimony regarding the SPIA. Van Horn testified that Dyer told her the SPIA would have an interest rate of 6% to 7% (A.R. 201.) Dyer testified that the SPIA quote he received from Old Mutual had a 2% to 3% interest rate, but he did not retain a copy of the quote. (A.R. 200.) Dyer also testified that he warned Van Horn that the SPIA would have a low yield of only 2%-3%, but the remainder of the four-part plan would make up for the loss

---

[1] Fidelity and Guaranty Life Insurance Company issued the policy; Old Mutual Financial Network purchased Fidelity and Guaranty Life Insurance Company shortly after the transaction. (A.R. 200.)

in interest rate as part of a Medicaid impoverishment strategy. (A.R. 200-01.) Van Horn, however, testified that Dyer did not warn her about the lower yield, did not discuss the importance a low-yielding SPIA to a Medicaid impoverishment strategy, and did not discuss the advantages and disadvantages of gifting money to her children prior to her death. (A.R. 201.) The Superintendent credited Van Horn's testimony over Dyer's testimony and found that Dyer "consistently failed to explain his plans to [Van Horn] in writing or to maintain adequate records of his planning activities and his conversations." (A.R. 202.)

The SPIA Van Horn purchased ended up yielding a negative interest rate. (A.R. 202.) The Old Mutual SPIA issued on June 20, 2005, for a premium of $39,326.50. (A.R. 202.) The SPIA had a fixed monthly payment of $648.23 for a five-year period. (A.R. 202.) At that rate, only $38,893.80 would be repaid at the end of the term, $432.70 less than Van Horn paid for the annuity. (A.R. 202.) The lower payments were due in part to the lower premium amount, the inclusion of a 2% premium tax, and Dyer's commission, the latter two of which were not discussed with Van Horn. (A.R. 202.) Old Mutual eventually increased the monthly payments to $662.65. (A.R. 202.)

Dyer attempted to remedy the problem on Van Horn's behalf. (A.R. 202.) At some point in October or November of 2007, Dyer testified that Old Mutual left a message on his answering machine promising to refund Van Horn her SPIA premium payment. (A.R. 202.) Dyer testified that he did not save the message because it was recorded on his digital answering machine, but that he played the message to Van Horn twice over the phone. (A.R. 202.) Van Horn testified that she had no memory of hearing the message and that she would have remembered if Old Mutual had made such a promise. (A.R. 202.) Dyer also told both Old Mutual and Bureau of Insurance staff that the company had left the message on his answering machine. (A.R. 203.) Old Mutual, however, had no record of such a call and Dyer offered no

documentation other than his own e-mails to Old Mutual to support any such message. (A.R. 203.) The Superintendent found that these e-mails were "part of a pattern of deception designed to persuade Old Mutual to compensate [Van Horn] so that [Dyer] would not be responsible for her losses." (A.R. 203.)

On April 24, 2008, Dyer and Van Horn filed a complaint against Old Mutual with the Bureau of Insurance regarding the SPIA that alleged, among other things, that Old Mutual was unresponsive to the problem with the SPIA. (A.R. 203.) Old Mutual contacted Dyer on June 27, 2008, seeking information about the purpose of the annuity, its suitability for Van Horn in comparison to the Modern Woodman annuity, whether Dyer considered annuitizing the Modern Woodman policy, any quotes Dyer received, and any promises made by Old Mutual. (A.R. 203.) When Dyer did not respond, Old Mutual contacted Dyer's attorney on September 3, 2008, seeking the same information. (A.R. 203.) In response, Dyer's attorney sent Old Mutual documents gathered during the purchase of the SPIA with a statement that the documents were self-explanatory. (A.R. 203.) Old Mutual terminated Dyer's appointment for failing to cooperate with a regulatory investigation and also determined that he violated certain Old Mutual sales practices by selling an improper replacement product to Van Horn. (A.R. 203.)

On December 16, 2009, the Bureau filed a petition of enforcement against Dyer alleging numerous violations of the Insurance Code. (A.R. 198.) A public adjudicatory hearing was held on December 2 and 3, 2010. (A.R. 198.) The administrative record closed on January 31, 2011, and the Superintendent issued a written decision on March 7, 2011. (A.R. 198, 207.)

In her written decision, the Superintendent concluded that in "his dealings with Van Horn, and in his subsequent responses to inquiries by the Bureau of Insurance and Old Mutual, Dyer committed serious violations of the Insurance Code," which demonstrated "incompetence

4

and untrustworthiness." (A.R. 205.) The Superintendent penalized Dyer for eleven acts that constituted, in most instances, multiple violations of the following sections of Title 24-A, the Insurance Code:

| | |
|---|---|
| • Breaching his Consultant Agreement with Van Horn by failing to make a proper evaluation of her plans and needs in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152 |
| • Selling Van Horn an annuity product that caused her unnecessary loss in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152 |
| • Representing to Van Horn that she would receive 6%-7% interest on the SPIA in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152<br>2153<br>2155 |
| • Selling Van Horn an annuity product without having reasonable grounds to believe it was suitable for her and without conducting an adequate investigation to determine its suitability in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152 |
| • Failing to provide Van Horn with an adequate explanation of the SPIA in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152<br>2155 |
| • Failing to obtain assurance from Van Horn that she understood the SPIA in violation of sections . . . | 1420K(1)(H)<br>1467<br>2152 |
| • Failing to make sure the SPIA was properly issued and would provide appropriate earnings in violation of sections . . . | 1420K(1)(H)<br>1467 |
| • Failing to keep adequate records of his alleged four-part plan in violation of sections . . . | 1420K(1)(H)<br>1447 |
| • Failing to cooperate with Old Mutual in its response to a regulatory investigation in violation of section . . . | 1420K(1)(H) |
| • Falsely representing to Old Mutual that it had left him an answering machine message promising Van Horn a refund of her SPIA premium payment in violation of sections . . . | 1420K(1)(H)<br>2152 |
| • Falsely representing to the Bureau of Insurance that Old Mutual had left him an answering message promising Van Horn a refund of her SPIA premium payment in violation of sections . . . | 1420K(1)(H)<br>2152 |

(A.R. 206.) The Superintendent fined Dyer $500 for each act, for a total of $5,500, revoked his producer license, and ordered him to pay restitution to Van Horn the full amount of

commissions and fees he received from any source for the transactions involving Van Horn. *See* 24-A M.R.S. § 12-A(1), (6) (2010); 24-A M.R.S. § 1420K(1)(H). Dyer filed this timely appeal in Kennebec County Superior Court on April 6, 2011. The appeal was fully briefed when accepted for transfer into the Business and Consumer Court on September 30, 2011. The court heard oral argument on December 2, 2011.

## *STANDARD OF REVIEW*

In an appeal of final agency action brought pursuant to M.R. Civ. P. 80C, this court reviews "the agency's decision for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Beauchene v. Dep't of Health & Human Servs.*, 2009 ME 24, ¶ 11, 965 A.2d 866, 870 (quotation marks omitted); *see also Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551, 555. In an 80C appeal of an agency's decision, the court may affirm the decision, 5 M.R.S. § 11007(4)(A) (2010), remand for further proceedings, 5 M.R.S. § 11007(4)(B) (2010), or:

> [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by bias or error of law;
> (5) Unsupported by substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C) (2010).

Factual findings must be affirmed if "they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 24, 15 A.3d 1263, 1271 (quotation marks omitted). Substantial evidence is "any competent evidence in the record to support a finding" based upon a review of the entire record to

determine whether "the agency could fairly and reasonably find the facts as it did." *Id.* "An agency's findings of fact will be vacated only if there is no competent evidence in the record to support a decision." *Id.* ¶ 24, 15 A.3d at 1272 (quotation marks omitted). Credibility determinations of witnesses are within the exclusive province of the Superintendent as fact finder. *See Sprague Elec. Co. v. Me. Unemployment Ins. Comm'n,* 544 A.2d 728, 732 (Me. 1988).

## DISCUSSION

I.   Credibility Determinations by the Superintendent

Because many of Dyer's arguments touch upon the Superintendent's credibility determinations of both Dyer and Van Horn, the court addresses that issues first. Dyer argues that the Superintendent erred in crediting Van Horn's testimony over his own because of her admitted memory lapses regarding the subject of the proceedings. Dyer argues that the clearly erroneous standard, which is equivalent to the substantial evidence standard in administrative proceedings, *see Ne. Empire Ltd. P'ship # 2 v. Town of Ashland,* 2003 ME 28, ¶ 9, 818 A.2d 1021, 1024, applies equally to determinations of credibility thus allowing the court to review the Superintendent's credibility determinations of witnesses.

While there is some support for this assertion in non-administrative proceedings, *see Beal v. Bangor Publ'g Co.,* 1998 Me 176, ¶ 10, 714 A.2d 805, 808, the better view in administrative proceedings is that credibility determinations are part of the fact-finding process. Conflicting testimony is presented in all types of proceedings, and a fact finder must evaluate the credibility of witnesses and weigh the relative strength or weakness of the evidence presented. A reviewing court, however, is not permitted to reevaluate credibility determinations or assign evidence lesser weight than the administrative fact-finder. *See Anderson v. Me. Pub. Emps. Ret. Sys.,* 2009 ME 134, ¶¶ 27-28, 985 A.2d 501, 507. The factfinder "is in the best position to evaluate the credibility of witnesses," and that testimony

7

cannot be discounted or dismissed unless it falls within the narrow exception of testimony that is "so farfetched as to *compel* its disbelief by the administrative agency." *W. S. Libbey Co. v. Me. Emp't Sec. Comm'n*, 446 A.2d 42, 44 (Me. 1982) (emphasis added); *accord Merrow v. Me. Unemp't Ins. Comm'n.*, 495 A.2d 1197, 1201 (Me. 1985). Testimony that is so farfetched as to compel disbelief is substantially the same as whether a factual finding is clearly erroneous: "A finding of fact is clearly erroneous if no record evidence exists to support it or if it is based on 'a clear misapprehension of the meaning of the evidence.'" *Street v. Bd. of Licensing of Auctioneers*, 2006 ME 6, ¶ 8, 889 A.2d 319, 321 (quoting *White v. Zela*, 1997 ME 8, ¶ 3, 687 A.2d 645, 646). Thus, the court does not agree that credibility determinations are to be subjected to clear error review, in as much as Dyer argues that the court must conduct an independent review of credibility determinations. Rather, the court's role is to review the record for competent evidence, taking into account the fact-finders stated credibility determinations, to determine whether "the agency could fairly and reasonably find the facts as it did." *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d at 1271 (quotation marks omitted).

Finally, Dyer suggested at oral argument that when a fact-finder is presented with testimony that is not contradicted by any other witness, the fact-finder cannot make findings contrary to that testimony based solely on her disbelief of the witness. That is not the case. *See Qualey v. Fulton*, 422 A.2d 773, 776 (Me. 1980).

> The fact that the testimony of a party to a suit is not directly contradicted does not necessarily make it conclusive and binding upon the [factfinder]. Of course it is not to be utterly disregarded and arbitrarily ignored without reason. It should be carefully considered and weighed with all of the other evidence in the case, and with all of the inferences to be properly drawn from facts established by the evidence; but if, on the whole case, it appears that such testimony is untrue, the [factfinder] is not required to put the stamp of verity upon it, merely because it is not directly contradicted by other testimony.

*Id.* at 775 (quoting *Mitchell v. Mitchell*, 136 Me. 406, 418, 11 A.2d 898, 904 (1940)).

8

In the present case, it is clear that the Superintendent credited the testimony of Van Horn over Dyer. (A.R. 202, 203.) The Superintendent recognized the memory issues of Van Horn but stated: "[W]hen she lacked memory of prior events, she readily acknowledged it. Her testimony on the most important points was clear and consistent, it was corroborated by the written evidence and the credible portions of Mr. Dyer's own testimony, and I find it highly credible." (A.R. 202.) Because credibility determinations of witnesses are within the exclusive province of the Superintendent as fact finder, *see Sprague Elec. Co.*, 544 A.2d at 732, the Superintendent's apparent discrediting of Dyer's testimony in favor of Van Horn's testimony is not error, nor does Van Horn's testimony fall within the category of evidence the evidence that is "so farfetched as to compel its disbelief by the administrative agency." *W. S. Libbey Co.*, 446 A.2d at 44.

## II.    Substantial Evidence for Factual Findings

Dyer's challenges the evidence supporting three factual findings by the Superintendent: 1) Van Horn did not understand what a SPIA or what a 1035 exchange was; 2) Dyer did not warn Van Horn that the SPIA would generate a lower yield; and 3) Dyer did not advise Van Horn of the advantages of gifting prior to her death. Although there was conflicting testimony from Van Horn and Dyer, each factual finding is supported by the testimony of Van Horn and thus competent record evidence. *See Sprague Elec. Co.*, 544 A.2d at 732; *W. S. Libbey Co.*, 446 A.2d at 44. (*See* A.R. 465, 500-01.)

## III.    Insufficient Evidence for Statutory Violations

Dyer's next challenge is to whether the Superintendent made sufficient factual findings to support the legal conclusions that Dyer violated of 24-A M.R.S. §§ 1420-K(1)(H), 1447, 2152, & 2155 (2010).

A.    Violations of 24-A M.R.S. § 1420-K(1)(H)

The Superintendent concluded that each of the eleven acts identified constituted a violation of 24-A M.R.S. § 1420-K(1)(H). Section 1420-K(1)(H) permits the Superintendent to

place on probation, suspend, revoke or refuse to issue or renew an insurance producer's license or . . . levy a civil penalty in accordance with section 12-A or take any combination of such actions, for any one or more of the following causes:

. . . .

H. Using fraudulent, coercive or dishonest practices, *or demonstrating incompetence, untrustworthiness or financial irresponsibility* in the conduct of business in this State or elsewhere.

24-A M.R.S. §§ 1420-K(1)(H) (emphasis added). Dyer argues that because the Superintendent made no findings that Dyer acted fraudulently or dishonestly, there is no factual basis for the conclusion that he violated this provision. The Superintendent, however, did not have to find that Dyer committed fraud or used dishonest practices to conclude he violated the provision; the statute also prohibits incompetent, untrustworthy, or financially irresponsible conduct in the course of business. All of the conduct on the part of Dyer could be considered any of those three and is supported by factual findings in the decision. In fact, the Superintendent's decision states this very conclusion: "In his dealings with [Van Horn], . . . Dyer committed serious violation of the Insurance Code, which demonstrate incompetence and untrustworthiness." (R. 205.)

B.    Violations of 24-A M.R.S. § 1447

The Superintendent concluded that Dyer violated 24-A M.R.S. § 1447 by failing to keep adequate records of his alleged four-part financial plan for Van Horn. It is undisputed that Dyer did not document his four-part plan. (A.R. 199-200.) Section 1447 requires an insurance producer to keep records for "each insurance policy or contract placed through or sold by the licensee," 24-A M.R.S. § 1447(1), "for a period of at least 3 years after completion of the

10

respective transactions," 24-A M.R.S. § 1447(2). Dyer argues that the statute does not require him to keep records of plans, only completed transactions. While best practice would be to document plans and keep them for future reference or inspection, the statute on its face requires retention of records of actual insurance transactions, meaning the procurement of insurance, and does not encompass records of plans or other activity short of transactions. The Superintendent's determination that Dyer's failure to keep a record of the plans constituted a violation of section 1447 was thus premised on an incorrect interpretation of the statute.[2]

C.     Violations of 24-A M.R.S. § 2152

The Superintendent concluded that eight of the eleven acts were in violation of section 2152. (A.R. 206.) Section 2152 provides: "No person shall engage in this State in any trade practice which is defined in this chapter, as, or determined pursuant to this chapter, to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." 24-A M.R.S. § 2152. The parties agree that "unfair" and "deceptive" are not defined in the Insurance Code, but analogize those terms to "unfair" and "deceptive" as defined by the Unfair Trade Practices Act, 5 M.R.S. §§ 205-A to 214 (2010).[3]

Dyer argues, and the court agrees, that the record is unclear as to how the Superintendent defined the terms "unfair" and "deceptive, and also unclear as to which of Dyer's

---

[2] The court notes that the Superintendent's finding that Mr. Dyer's failure to keep adequate records of the four-part plan violated 24-A M.R.S. § 1420K(1)(H) is affirmed in this decision, *see supra* II, A.

[3] To justify a finding of unfairness under UTPA, the act or practice: (1) must cause, or be likely to cause, substantial injury to a client; (2) that is not reasonably avoidable by the client; and (3) that is not outweighed by any countervailing benefits to the client. *See State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206.

> An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead [a client] acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to [the client] and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of section 2152], regardless of . . . good faith or lack of intent to deceive.

*See id.* ¶ 17, 868 A.2d at 206 (quotation marks and citations omitted). "Determination of whether an act or practice is 'unfair or deceptive' . . . must be made by the fact-finder on a case-by-case basis." *Id.* ¶ 15, 868 A.2d at 206.

acts or practices were unfair or deceptive. The definitional vagueness is less problematic as to the term "deceptive" than it is as to the broader term "unfair," which likely subsumes deception and a host of other negative attributes. But even if the definitions applied were clear, the Superintendent's reasoning in finding eight acts deceptive or unfair, or both, is not.

The only explicit finding of deception or unfairness in the decision is a finding of deception regarding false representations made by Dyer to Old Mutual that it had left him an answering machine message promising Van Horn a refund of her SPIA premium payment. (A.R. 203, 206.) The decision does not identify whether the other remaining seven acts were unfair, or deceptive, or both. Because on this record the court cannot determine the basis for the Superintendent's conclusions that Dyer violated section 2152, the court must vacate that portion of the decision and remand for further factual findings. *See Widewaters Stillwater Co. v. Bangor Area Citizens Organized for Responsible Dev.*, 2002 ME 27, ¶ 12, 790 A.2d 597, 601.

D.    Violations of 24-A M.R.S. § 2155

The Superintendent concluded that two of Dyer's acts were two violations of 24-A M.R.S. § 2155: 1) representing to Van Horn that she would receive 6-7% interest on the SPIA, and 2) failing to provide Van Horn with an adequate explanation of the SPIA. Section 2155 provides:

> No person shall make or issue, or cause to be made or issued, any written or oral statement misrepresenting or making incomplete comparisons as to the terms, conditions, or benefits contained in any policy *for the purpose of inducing or attempting or tending to induce* the policyholder to lapse, forfeit, borrow against, surrender, retain, exchange, modify, convert, or otherwise affect or dispose of any insurance policy.

24-A M.R.S. § 2155 (emphasis added).

Dyer argues that because the Superintendent did not find that he acted with "purpose," there is insufficient evidence to constitute a violation of the statue. As the Superintendent points out, however, a purposeful intent is not required to violated the statute; the statute can

12

be violated by making misrepresentations "tending to induce" a change or disposition of an insurance policy. Competent record evidence shows that if Dyer had told Van Horn that the interest rate would have been lower or explained the SPIA to her, she would not have proceeded. (A.R. 500-01.)

IV.    Exclusion of Evidence

Title 5 M.R.S. § 9057 (2010) governs evidence in administrative proceedings and states, in pertinent part, that: "Evidence shall be admitted if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs. Agencies may exclude irrelevant or unduly repetitious evidence." 5 M.R.S. § 9057(2). "No sworn written evidence shall be admitted unless the author is available for cross-examination or subject to subpoena, except for good cause shown." 5 M.R.S. § 9057(5). Dyer challenges the exclusion of two items of evidence offered by Dyer: testimony by John Consigli, a polygraph examiner, and an affidavit of Katherine LaPierre.

A.    Consigli Testimony

Consigli is a polygraph examiner who proposed to testify regarding a polygraph exam he conducted on Dyer and the subsequent report. (A.R. 598-99; 158-65.) The Superintendent excluded his testimony at the hearing, citing *State v. Lavoie*, 2010 ME 76, 1 A.3d 408, and *Ingerson v. State*, 448 A.2d 879 (Me. 1982). (A.R. 605.) The Superintendent allowed Dyer to brief the issue in post-hearing submissions, and she again concluded that Consigli's testimony was not admissible on largely the same basis. (A.R. 183-85.)

In *Lavoie*, the Law Court reiterated a "long-standing, fundamental concern regarding polygraph machines due to their non-existent value when it comes to determining credibility" in both criminal and civil cases. 2010 ME 76, ¶ 14, 1 A.3d at 412; *accord Heselton v. Wilder*, 496 A.2d 1063, 1066-67 (Me. 1985) (holding in a civil case that "the results of a polygraph

13

examination are entitled to no weight" and an individual's willingness to take a polygraph test is inadmissible). Polygraph tests are neither reliable nor valid and implicate "the dangerous possibility that credibility will be evaluated by the device rather than by the trier of fact." *Lavoie*, 2010 ME 76, ¶ 14, 1 A.3d at 412. The Law Court has also indicated that these concerns regarding a polygraph apply equally to administrative proceedings, which are not criminal trials and to which the Rules of Evidence do not apply. *See Ingerson*, 448A.2d at 880.

Dyer's basic argument is that the Superintendent was not bound by the Rules of Evidence and because Dyer's counsel would have laid an adequate foundation for the testimony, the testimony should have been admitted. Dyer attempts to distinguish *Ingerson* on the grounds that the examiner was available to testify and would have been subject to cross-examination by the Bureau of Insurance. Dyer also points to cases from other jurisdictions in which polygraph evidence has been admitted. *See Evans v. DeRidder Mun. Fire*, 815 So.2d 61 (La. 2002); *Motell v. Napolitano*, 588 N.Y.S.2d 452 (N.Y. App. Div. 1992). Given, however, the Law Court's well-documented suspicion of polygraphs, it was not error for the Superintendent to exclude Consigli's testimony.

B.     LaPierre Affidavit

In post-hearing submissions, Dyer filed the LaPierre affidavit, which was not submitted or presented at the hearing. (A.R. 171-72.) LaPierre is Van Horn's granddaughter and was present for some of the meetings between Dyer and Van Horn. (A.R. 171.) The Bureau objected to the late filing of the affidavit. Dyer had wanted to call LaPierre as a witness but thought that LaPierre was deceased at the time of the hearing. (A.R. 182.) But, apparently, as evidenced by her affidavit, she was not deceased. (A.R. 182.) The Superintendent sustained the Bureau's objection to the late admission of evidence because Dyer offered no explanation for

14

why she was not called to testify at the hearing and because the affidavit is somewhat vague. (A.R. 182-83.)

Dyer argues that "good cause" exists because he had thought LaPierre had passed away prior to the hearing, and only learned *at* the hearing that she was still alive. This argument, however, was not presented to the Superintendent, nor did Dyer ever move to supplement the record with the affidavit either at the administrative level or to this court. Although filed with the administrative record, the LaPierre evidence was never properly before the Superintendent and thus her decision not to consider that evidence was wholly justified.

V.    Bias

Finally, Dyer asserts that the decision of the Superintendent is evidence of her bias against him. Dyer also asserts that the decision to pursue the Van Horn matter was based on the Bureau's dissatisfaction with the outcome of another matter before the Superintendent, the Russell matter. At oral argument Dyer admitted that there was no affirmative evidence of bias on the part of the Superintendent, but the court could extrapolate bias from the quantity and magnitude of alleged inconsistencies in the Superintendent's decision. The court, however, can divine no evidence of bias from the record.

*CONCLUSION*

Based on the foregoing the court decides and orders as follows:

1.    The court vacates that portion of the Superintendent's decision finding violations of 24-A M.R.S. § 2152 and remands to the Superintendent for further findings of fact and conclusions of law regarding what constitutes a "deceptive" or "unfair" act under the statute and how Dyer's acts qualify as "deceptive" or "unfair," or both. On remand, the Superintendent shall review and utilize the current record only.

15

2. The court vacates that portion of the Superintendent's decision finding a violation of 24-A M.R.S. § 1447.

3. Because the section 2152 findings were an element of eight of the violations found and because the section 1447 violation was the basis for a ninth violation, the entire question of penalties will have to be revisited on remand. The court vacates the license revocation, the civil fines, and the restitution imposed with instructions for the Superintendent to reconsider appropriate penalties in light of this decision and in light of any further findings and conclusion made by the Superintendent on remand. Any penalties imposed after reconsideration, however, may not be more onerous than the penalties imposed initially.

4. In all other respects, the decision of the Superintendent of Insurance dated March 7, 2011, is affirmed.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Dated: 18 J4n 2012

A. M. Horton, Justice
Maine Business & Consumer Court

Entered on the Docket: 1.18.12
Copies sent via Mail ___ Electronically ✓

16

# BUSINESS AND CONSUMER COURT

## Paul A. Dyer v. Superintendent of Insurance
## BCD-AP-2011-11

### *Counsel of Record*

| Attorney Name | Party Name |
|---|---|
| Adrianne Fouts, Esq. | Paul A. Dyer |
| Jonathan Bolton, AAG | Superintendent of Insurance |